UNITED STATES of America, Plaintiff,

v.

LOCAL 1804–1, INTERNATIONAL LONGSHOREMEN'S ASSOCIATION, et al., Defendant.

Donald CARSON and Peggy Carson, Plaintiffs,

v.

LOCAL 1588, INTERNATIONAL LONGSHOREMEN'S ASSOCIATION, its Officers, Executive Board, and Trustees, et al., Defendants.

Nos. 90 Civ. 0963 (LBS), 90 Civ. 5618 (LBS).

United States District Court, S.D. New York.

Jan. 14, 1993.

As Amended Feb. 17, 1993.

As Amended April 14, 1993.

---

1304

Otto G. Obermaier, U.S. Atty., S.D.N.Y. (Chad A. Vignola, Claude M. Millman, New York City, Asst. U.S. Attys., of counsel), for U.S.

Frederic J. Gross Law Firm, Mount Ephraim, NJ (Frederic J. Gross, of counsel), for Donald Carson.

Anthony Gallagher, pro se.

Freeman, Nooter & Ginsberg, New York City (Lou Freeman, of counsel), for George Lachnicht.

Goldman & Hafetz, New York City (Frederick P. Hafetz, Susan R. Necheles, of counsel), for Venero Mangano.

Vladeck, Waldman, Elias & Engelhard, P.C., New York City (Seymour M. Waldman, Julian Birnbaum, of counsel), for ILA Local 1909.

Gleason & Mathews, New York City (Thomas W. Gleason, Ernest L. Mathews, Jr., Kevin Marrinan, of counsel), for ILA Locals 824, 1809.

Bogucki & Scotto, Garden City, NY (Robert H. Bogucki, of counsel), for ILA Local 1814.

Donna Newman, Jersey City, NJ, Law Office of Larry Bronson, Bayonne, NJ, Larry Bronson, for ILA Local 1588.

## OPINION

SAND, District Judge.

On February 14, 1990, the government instituted this civil action pursuant to the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961, *et seq.* ("RICO"), alleging a pervasive influence of organized crime over the Port of New York and New Jersey (the "Waterfront"). The complaint named as defendants six locals of the International Longshoremen's Association (the "ILA") [1], several union officers, several purported members of the Genovese and Gambino organized crime families, two waterfront employers, and two waterfront employers' organizations.[2] In total there were more than eighty individuals and entities named as defendants in the complaint.

The non-jury trial in this case began on April 15, 1991, and consumed approximately ten trial weeks over an eleven month period.[3] Before, during, and after the trial, most of the defendants in this case either defaulted or entered into consent decrees or consent judgments with the government. As a result, only four individual defendants remain in the case today: Donald Carson, Anthony Gallagher, George Lachnicht, and Venero Mangano (collectively the "remaining defendants").

In its demand for relief, the government seeks to enjoin the remaining defendants from participating in (1) any activities on the New York/New Jersey Waterfront; (2) the affairs of the ILA, any of its locals, or any other labor organization about any matters which relate directly or indirectly to the affairs of the ILA, any of its locals, or any other labor organization; and (3) in the ownership, operation or employment of or by any Waterfront employer. The complaint also seeks to enjoin the defendants from committing any acts of racketeering activity and from associating, directly or indirectly, with any member of La Cosa Nostra. Finally, the government seeks a disgorgement of the proceeds of any violations of the civil RICO statute. Amended Complaint at 120–24.

The task before the Court is to determine whether these four defendants participated in a criminal enterprise and are liable for civil penalties set forth in the RICO statute. We must also consider the issues raised in *Carson v. Local 1588*, 769 F.Supp. 141 (1991), a consolidated case in which defendant Donald Carson claims entitlement to pension benefits. After careful consideration of all the evidence in this case—including live testimony which comprised more than 5000 pages in transcript form, deposition testimony, and more than ten thousand trial exhibits—this Court concludes that the Government has proved by a preponderance of the evidence the existence of the RICO enterprise. We also conclude that the government proved defendants Carson, Gallagher, Mangano, and Lachnicht's participation in the enterprise by the commission of two predicate acts. Finally, this Court concludes that defendant Carson is not entitled to pension benefits from Local 1588. This Opinion constitutes the Court's decision, and includes the Court's findings of fact and conclusions of law pursuant to Fed.R.Civ.P. 52(a).[4]

---

**1.** Named as defendants were ILA Locals 1804–1, 1588, 1814, 1809, 824, and 1909, as well as twenty-five sitting officers of those locals and nine former officers.

**2.** The union locals, the waterfront employers, and the employers' organizations were not named as RICO violators, but as nominal defendants in order to effectuate complete relief.

**3.** The trial occurred during the periods from April 15, 1991 to May 10, 1991; September 30, 1991 to November 26, 1991; and intermittently thereafter through March 26, 1992.

**4.** This Opinion marks the culmination of the liability phase of the case. Having determined that the defendants are liable to the government under the RICO statute, it remains to be deter-

## DISCUSSION

The government asserts that it is entitled to the civil remedies set forth in 18 U.S.C. § 1964 because the defendants violated 18 U.S.C. § 1962(c), which provides, in pertinent part:

It shall be unlawful for any person employed by or associated with any enterprise engaged in ... interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity.

18 U.S.C. § 1962(c). *See* Amended Complaint ¶¶ 71–106.[5] The government alleges a number of predicate acts for each of the defendants.[6] *See Id.,* ¶¶ 73–106.

The terms "enterprise," "racketeering activity" and "pattern of racketeering activity," are defined in § 1961 as follows:

(1) "racketeering activity" means (A) any act or threat involving murder, kidnapping, gambling, arson, robbery, bribery, extortion, dealing in obscene matter, or dealing in narcotic or other dangerous drugs, which is chargeable under State law and punishable by imprisonment for more than one year; (B) any act which is indictable under any of the following provisions of Title 18, United States Code: Section 201 (relating to bribery) ... section 664 (relating to embezzlement from pension and welfare funds) ... section 1341 (relating to mail fraud), section 1343 (relating to wire fraud) ... section 1951 (relating to interference with commerce, by robbery or extortion), section 1952 (relating to racketeering) ... (C) any act which is indictable under title 29, United

States Code, section 186 (dealing with restrictions on payments and loans to labor organizations) or section 501(c) (relating to embezzlement from union funds)

\*　\*　\*　\*　\*　\*

(4) "enterprise" includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity;

(5) "pattern of racketeering activity" requires at least two acts of racketeering activity, one of which occurred after the effective date of this chapter and the last of which occurred within ten years (excluding any period of imprisonment) after the commission of a prior act of racketeering activity.

18 U.S.C. §§ 1961(1), (4), and (5).

█ Since the government is seeking civil remedies—rather than criminal penalties—under the RICO statute, it must prove each element of the statute by a preponderance of the evidence. *Liquid Air Corp. v. Rogers,* 834 F.2d 1297, 1302 (7th Cir.1987), *cert. denied,* 492 U.S. 917, 109 S.Ct. 3241, 106 L.Ed.2d 588 (1989); *United States v. Local 560,* 780 F.2d 267, 279–80 n. 12 (3rd Cir.1985), *cert. denied,* 476 U.S. 1140, 106 S.Ct. 2247, 90 L.Ed.2d 693 (1986); *United States v. Local 359,* 705 F.Supp. 894, 897 (S.D.N.Y.), *aff'd in part, remanded in part,* 889 F.2d 1232 (2d Cir. 1989); *see also Sedima, S.P.R.L. v. Imrex Co.,* 473 U.S. 479, 491, 105 S.Ct. 3275, 3282, 87 L.Ed.2d 346 (1985) ("That the offending conduct is described by reference to criminal statutes does not mean that its occur-

---

mined, in further proceedings, the consequences of that liability.

**5.** In the Amended Complaint, the government asserted three additional claims for relief: First, it alleged that the defendants violated § 1962(d) which makes it unlawful to conspire to violate § 1962(c); second, it asserted a claim under § 1962(b) which makes it unlawful for any person to "acquire or maintain, directly or indirectly, any interest in or control of any" criminal enterprise; and finally, the government alleged that the defendants violated § 1962(d) which makes it unlawful to conspire to violate § 1962(b). *See* Amended Complaint ¶¶ 107, 109, 110. The government alleged the same

predicate acts for each of its claims. *See id.,* ¶¶ 73–104. Apparently the government has abandoned these claims, for it failed to propose findings of fact and conclusions of law with regard to these claims. *See* Govt's Amended Proposed Findings of Fact & Conclusions of Law at 64.

**6.** Since the majority of the defendants named in the complaint are no longer parties in this case, a number of the predicate acts alleged in the complaint are irrelevant. In its Amended Proposed Findings of Fact and Conclusions of Law, the government has isolated those predicate acts that relate only to the remaining defendants.

rence must be established by criminal standards.").

With these standards in mind, the Court will now consider whether the government has met its burden of proving each element of a civil RICO claim. In Part I, the Court will determine whether the government has proved the existence of a RICO enterprise. In Part II, the Court will determine whether the government offered sufficient evidence to demonstrate a "pattern of racketeering activity." In Part III, the Court will summarize each defendant's alleged participation in the RICO enterprise. Finally, in Part IV, the Court will determine whether the predicate acts allegedly committed by each defendant have been proved.

## I.

### THE WATERFRONT ENTERPRISE

This Court must first determine whether the government has adduced sufficient evidence to prove the existence of an "enterprise," for "the essence of the violation is the commission of [racketeering] acts in connection with the conduct of an enterprise." *Sedima*, 473 U.S. at 497, 105 S.Ct. at 3285. The Complaint alleges that the RICO enterprise in this case is the "Waterfront" which the government defines as the "unholy alliance" among ILA, ILA union officials, Waterfront businessmen, members of the Genovese organized crime family in New Jersey, and members of the Gambino organized crime family and their henchmen, the Westies, in Brooklyn and Manhattan. Government's Amended Proposed Findings of Fact & Conclusions of Law ("Govt's PFF & CL") ¶ 3; Amended Complaint ¶¶ 69-70. According to the government, the objective of the enterprise was "the corrupt control and influence of Waterfront industries and labor unions [by the defendants] in order to enrich themselves and their associates." Complaint ¶ 70. This objective was allegedly accomplished through a cooperative arrangement between the Gambino and Genovese crime families, whereby each recognized and respected the other's sphere of influence and control on the Waterfront. *Id.*

Before the Court sets forth its findings of fact with regard to the existence of a Waterfront enterprise, a few observations are in order regarding the nature of the task confronting the Court.

Several of the parties have expressed concerns about the breadth of the factual findings that this Court is required to make. ILA locals 824, 1588, 1809, 1814, and 1909—all of which were named as defendants in the complaint but subsequently entered into consent judgments in complete settlement of the government's claims against them—submitted an amicus curiae brief arguing that the Court should not make findings of fact with regard to any of the individuals or entities as to whom consent judgments have been entered. Essentially, the amici make two points. First, since many of the named defendants did not participate in the trial, but instead settled or defaulted, the amici claim that the Court was presented with a "one-sided, unopposed case from which to make its determinations." Amici Br. at 2. Moreover, amici argue, since the remaining defendants are indifferent to certain "institutional" interests of the amici—namely, the effect of the Court's decision upon "developing labor law, the duties of union officers, or the fortunes of the labor organization"—the remaining defendants did not challenge the government's case with regard to these issues with sufficient vigor. *Id.* at 16–17.

One example of the one-sided nature of the trial proofs is the failure of any of the defendants who participated in the trial to challenge that the "Waterfront" constituted a RICO enterprise. The Court recognizes that this was due, in large part, to the fact that a vast majority of the defendants either defaulted or settled with the government. The remaining defendants devoted their time and energy at trial, and in their post trial submissions, to disputing the government's contention that they had participated in the criminal enterprise by committing the alleged predicate acts. In essence, these defendants took a position which assumed the existence of the "Waterfront" enterprise. This Court recognizes the ami-

ci's concern as a legitimate one. Accordingly, the Court has made independent inquiries into the evidence presented by the government, and reaches the conclusion that the Waterfront constitutes an enterprise within the meaning of the RICO statute only after careful scrutiny of the government's case.

■ In their brief, the amici express a second concern about the potential adverse consequences to the settling defendants from any factual determinations made by the Court with regard to those defendants. Presumably, amici worry not only about "bad press" from adverse factual findings, but also about any potential res judicata or collateral estoppel effect of this Court's decision. In order to avoid this problem, the amici conclude that all reference to the settling defendants should be avoided by the Court. This Court disagrees. The amici ignore the fact that many of the settling defendants are alleged co-conspirators of the remaining defendants. As such, the alleged illegal conduct of both groups of defendants is inextricably interwoven, and, as a practical matter, it would be impossible to address the conduct of the remaining defendants without occasionally making factual findings concerning the settling defendants. Amici cite no authority for the proposition that a witness or co-conspirator, who is not a party to an action, is entitled to have his name omitted from pertinent factual discussions of claims against defendants to a lawsuit. Therefore, we hold that we may make factual findings involving persons no longer parties to this action where appropriate.

Furthermore, this Court believes that the danger of unnecessary factual findings has been at least partially mitigated by the fact that the government avoided references to the settling defendants in its Proposed Findings of Fact unless their participation

in racketeering plainly pertained to claims against the remaining defendants. *See* Government's Reply Memorandum at 3. So too, the Court, to the extent possible, will avoid any unnecessary mention of those no longer parties to the action and will find only those facts upon which it has based its final judgment.[7]

One final observation is appropriate. This Court is called upon to make findings of fact pursuant to Fed.R.Civ.P. 52. Pursuant to this rule, the Court has requested proposed findings of fact and conclusions of law from each of the remaining parties in this litigation. By utilizing this procedure the Court has sought to ascertain the parties' views on each of the disputed issues of law and fact. The Court recognizes that Rule 52 requires it to weigh and appraise the evidence offered, not by one party to the controversy, but by all parties. *Dole Fresh Fruit Co. v. United Bananas Co.*, 821 F.2d 106, 109 n. 2 (2d Cir.1987). Contrary to what the amici assert, the Court has no intention of merely "rubber stamping" the government's proposed findings of fact. *See* Amici Br. at 16. The Court hardly needs reminding that the mere adoption of one side's proposed findings would be an abdication of its responsibility as finder of fact.

Having made these preliminary observations, the Court turns to its findings of fact with regard to the existence of the RICO enterprise.

*Findings of Fact*

■ During the course of the trial, the government's proffered evidence of the existence of the RICO enterprise consisted principally of: (1) public reports documenting conclusions and findings developed from extensive factual investigation and analysis; (2) eye witness and expert testimony; and (3) electronic surveillance interceptions.[8] After carefully considering all

---

7. The amici make two other points in their brief. First, they claim that default judgments should have been entered against various defendants. In fact, default judgments have been entered against all defendants who have defaulted. Second, the amici claim that certain factual assertions by the government are not supported by the record. The government's proposed find-

ings of fact have been adopted only when supported by the record.

8. In *United States v. Carson*, 969 F.2d 1480 (3d Cir.1992), the Third Circuit held that 108 tapes obtained by the United States Attorney's Office for the District of New Jersey pursuant to Title III of the Omnibus Crime Control and Safe

of the evidence, this Court concludes that the government proved the existence of a Waterfront enterprise by a preponderance of the evidence.

The New York/New Jersey Waterfront is an integrated economic marketplace composed of several separate ports occupying a common harbor and encompassing some 1500 square miles and 234 municipalities. The Waterfront harbor plays a critical role in the movement of manufactured, agricultural, and other goods throughout the eastern seaboard and has a major impact on this nation's commerce.

The history of La Cosa Nostra's (LCN's)[9] infiltration of and influence over the Waterfront has been well-documented. The Court admitted, pursuant to Fed. R.Evid. 803(8)(C),[10] portions of several official reports which document the existence of LCN and its invidious influence over ILA and the Waterfront. Tr. 1490. Specifically, the Court admitted the following reports: (1) Report of the President's Commission on Organized Crime, *THE EDGE: Organized Crime, Business, and Labor Unions* (1986) ("PCOC Report") (GX 2256); (2) Report of the Senate Permanent Subcommittee on Investigations, *Waterfront Corruption* (March 27, 1984) ("1984 Senate Report") (GX 2259); and (3) Hearings Before the Permanent Subcommittee on Investigations of the Senate Committee on Governmental Affairs, *Organized Crime: 25 Years After Valachi* (1988) ("1988 Senate Report") (GX 2258). These reports were the result of extensive investigations of organized crime's influence on the Waterfront, and the factual findings therein were based upon both independent, public fact-finding hearings and several successful criminal investigations and prosecutions.

These reports document that the piers of New York and New Jersey have been fertile ground for organized crime for the better part of this century, and that control of union locals has been an integral part of organized crime's schemes to exploit the Waterfront. *See also Fourth Report of the N.Y. State Crime Comm'n to the Governor* 11–56 (1953) (GX 2273). The President's Commission on Organized Crime describes how LCN gained influence over the Waterfront through control of the local unions:

> Criminal activities have always prospered on the docks. The necessity for speed [because of perishable cargo], plus the lack of rail connections to the piers, gave rise to the coveted "loading" racket, which involved moving cargo from the pier floor to waiting trucks. Since demand for cargo loading was inelastic and dependent upon immediate need when ships arrived, *loading generated extraordinary profits, and was a principal incentive for organized crime to infiltrate the ILA....* The waterfront work force—casual, unskilled, demoralized, insecure due to hiring practices,

---

Streets Act of 1968 should have been suppressed in the criminal case against defendants Anthony Gallagher and Donald Carson. Seven exhibits received in evidence in this case were derived from those suppressed tapes. *See* GX 107AA DIG, 108AA DIG, 109AA DIG, 109BB DIG, 113AA DIG, 114AA DIG, and 115AA DIG. The government excised from its Amended Proposed Findings of Fact & Conclusions of Law all references to the suppressed tapes. This Court believes that the government succeeded in proving the existence of the RICO enterprise by a preponderance of the evidence without consideration of these tapes. This Court will revisit the tape issue in connection with its discussion of the MOTBY operation. *See* part IV.A *infra.*

9. La Cosa Nostra is a nationwide criminal organization consisting of various organized crime "families," including the Gambino and Genovese families. *See, e.g., United States v. Salerno,* 868

F.2d 524, 528 (2d Cir.1989) (proof of ruling LCN Commission and Genovese and Gambino Families).

10. Federal Rule of Evidence 803 provides, in pertinent part: The following are not excluded by the hearsay rule, even though the declarant is available as a witness:

 ....

 (8) **Public records and reports.** Records, reports, statements, or data compilations, in any form, of public offices or agencies, setting forth ... (C) in civil actions and proceedings and against the Government in criminal cases, factual findings resulting from an investigation made pursuant to authority granted by law, unless the sources of information or other circumstances indicate lack of trustworthiness.

Fed.R.Evid. 803(8)(C).

and frequently immigrant—was fertile territory for gamblers and loan sharks. GX 2256 at 33–34 (PCOC Report) (emphasis added). Organized crime members quickly understood that control of the local unions was a "prerequisite" to conducting racket operations on the piers. *Id.* Control of the unions enabled the crime families to profit from kickbacks and other traditional racketeering schemes, including gambling, loan sharking, theft, and fraud. LCN infiltration of the ILA became so pervasive that the American Federation of Labor expelled the ILA on September 23, 1953.[11] Unfortunately, the expulsion did nothing to curb organized crime's influence over ILA.

The evidence presented at trial demonstrated that since the late 1950's, the Gambino and Genovese crime families have shared control of the Waterfront. Vito Genovese and Carlo Gambino, former bosses of the two families, entered into an "arrangement" by which it was agreed that the Gambino family would dominate the Brooklyn piers, and the Genovese family would dominate the New Jersey piers. GX 2256 at 37–38 (PCOC Report); GX 2259 at 45–71 (1984 Senate Report); GX 2257 at 254–57 (1981 Senate Report). Electronic interceptions of conversations confirm the existence of this arrangement. For example, in a May 31, 1983 intercept, former (now deceased) Gambino crime boss Paul Castellano discussed the nature of the Gambino and Genovese families partnership with Thomas Gambino, a Capo:

CASTELLANO: You see what I'm doing with the ILA? What we tried to do from the very beginning, partnership. Why? Cause we've got Brooklyn. Getting a few dollars off (IA).[12] And they had the International.

GAMBINO: Yeah. Yeah.

CASTELLANO: Okay? And we could do a lot of things with the guy, cause if you go partners with them, I feel we'd improve.

GX 3236–B at 26–27. From the outset, the nature of the Gambino and Genovese families' cooperative "venture" was the criminal exploitation of the Waterfront.

There have been many criminal prosecutions which confirm LCN's corrupt influence on the New York/New Jersey waterfront, and demonstrate that La Cosa Nostra is still a dominant Waterfront presence.[13] Most noteworthy are the prosecutions denominated UNIRAC ("Union Racketeering"), which were commenced in 1975, and which disclosed that LCN had obtained control of the Waterfront by using the New York and New Jersey ILA union locals as leverage to engage in racketeering activities. These racketeering activities included the extortion of money from many steamship and stevedore companies seeking the "privilege" of doing business on the Waterfront, and widespread illegal payoffs by businessmen to union officials in order to gain an unlawful advantage over their competitors. GX 2259 at 9, 28, 34 (1984

---

**11.** The Executive Council of the AFL–CIO subsequently explained the expulsion order as follows:

This action, severing an affiliation of 60 years, was taken because of public disclosure of crime and corruption on the New York waterfront, which established that the ILA had permitted irresponsible, corrupt and criminal elements to fasten themselves upon the body of the organization and destroy its integrity, its effectiveness and its trade union character and because the ILA ... stubbornly refused to rid itself of corrupt elements and to take other corrective action necessary to a fulfillment of its responsibilities as a labor organization worthy of affiliation with the AFL.

GX 2256 at 33–34 (PCOC Report).

**12.** IA is an abbreviation that indicates those portions of the intercept that are inaudible.

**13.** *See, e.g.,* (1) *"Westies"* murder and extortion prosecutions (*United States v. Coonan, et al.,* 87 Cr. 249 (S.D.N.Y.) (WK), *aff'd,* 876 F.2d 891 (2d Cir.), *cert. denied,* 493 U.S. 975, 110 S.Ct. 499, 107 L.Ed.2d 502 (1989) and *United States v. Kelly,* 938 F.2d 1553 (2d Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 1486, 117 L.Ed.2d 628 (1992)); (2) UNIRAC labor racketeering prosecutions (*e.g., United States v. Clemente, et al.,* 494 F.Supp. 1310 (S.D.N.Y.1980), *aff'd,* 640 F.2d 1069 (2d Cir.), *cert. denied,* 454 U.S. 820, 102 S.Ct. 102, 70 L.Ed.2d 91 (1981)); (3) Twenty-year bank manipulation of union benefit funds by ILA officers and LCN associates (*United States v. Guido, et al.,* 90 Cr. 60 (E.D.N.Y.) (ILG)) (GX 2000 February 1990 plea minutes); and (4) Job-selling receipt of a bribe by Gambino family associate/ILA official (*People v. Lagana,* Ind. No. 88/6724 (N.Y.Sup.Ct.Kings Co.)) (GX 3301, February 1990 plea minutes).

Senate Report); GX 2256 at 40 (FCOC Report). A partial summary of the Genovese family's UNIRAC racketeering is set forth in *United States v. Clemente*, 640 F.2d 1069, 1071–76 (2d Cir.1981), while the Gambino family's UNIRAC racketeering is described in *United States v. Scotto*, 641 F.2d 47, 51–52 (2d Cir.1980).[14]

Subsequent investigations by federal and state authorities indicate that organized crime's influence over ILA locals did not end with UNIRAC. The Senate Permanent Subcommittee on Investigations concluded in its 1984 Report that despite many successes, the government had failed to "rid the waterfronts of all crime and all criminals. Corrupt practices ... already have begun to return to the Atlantic and gulf coast docks." GX 2259 at 9 (1984 Senate Report). A few years later, the President's Commission on Organized Crime concluded that "[d]espite the success of UNIRAC the Genovese crime family continues to maintain a firm hold on the New Jersey waterfront," and the ILA remains a "nest for waterfront pirates—a racket, not a union." GX 2256 at 33 (quoting D. Dubinsky and A. Raskin, *David Dubinsky: A Life With Labor* 164 (1977)). Finally, the 1988 hearings before the Senate Permanent Subcommittee on Investigations also confirm LCN's continuing influence over the Waterfront.

*Conclusions of Law*

Based upon the materials set forth in these studies and the evidence independently introduced in this trial, this Court holds that the government has proven the existence of the Waterfront enterprise by a preponderance of the evidence.

■ The RICO statute defines "enterprise" as, *inter alia*, "any individual, partnership, corporation, association, or other legal entity, and any union or group of

individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). The language and legislative history of the statute indicates that Congress sought to define the term "enterprise" as broadly as possible. *United States v. Indelicato*, 865 F.2d 1370, 1382 (2d Cir.1989). The Supreme Court has explained that a RICO enterprise can be proved "by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit." *United States v. Turkette*, 452 U.S. 576, 583, 101 S.Ct. 2524, 2528, 69 L.Ed.2d 246 (1981). *See also United States v. Coonan*, 938 F.2d 1553, 1559 (2d Cir.1991), *cert. denied, Kelly v. United States*, ―― U.S. ――, 112 S.Ct. 1486, 117 L.Ed.2d 628 (1992). Proof of various racketeering acts may be relied on to establish the existence of the enterprise. *Coonan*, 938 F.2d at 1560.[15]

"The enterprise can be *any* enterprise." *United States v. Porcelli*, 865 F.2d 1352, 1362 (2d Cir.1989). The statute makes explicit reference to unions and businesses, and several courts have held that unions and businesses can constitute RICO enterprises. *See e.g., United States v. Stolfi*, 889 F.2d 378, 380 (2d Cir.1989) ("a racketeering enterprise may consist of an association of separate legal entities") (union local and its benefit funds constitute enterprise). Section 1962 applies to both legitimate and illegitimate enterprises. *Turkette*, 452 U.S. at 585, 101 S.Ct. at 2529–30. The Court must consider the activities and relationships among the separate entities to determine which entities are part of the enterprise and which are not. *United States v. District Council*, 778 F.Supp. 738, 757 (S.D.N.Y.1991) (Haight, J.).

■ Section 1961(4) describes two categories of associations that come within the

14. As of February 1981, the UNIRAC investigations had resulted in 129 indictments and 117 convictions. Those convicted included 52 union officials, nine of whom were organized crime members or associates, management officials and corporations, and other members or associates of organized crime families.

15. The Supreme Court has noted:

> While the proof used to establish [the "enterprise" and the "pattern of racketeering activi-

ty"] may in particular cases coalesce, proof of one does not necessarily establish the other. The "enterprise" is not the "pattern of racketeering activity"; it is an entity separate and apart from the pattern of activity in which it engages. The existence of an enterprise at all times remains a separate element which must be proved by the Government.

*Turkette*, 452 U.S. at 583, 101 S.Ct. at 2528–29.

purview of the "enterprise" definition. *See Turkette,* 452 U.S. at 581–82, 101 S.Ct. at 2527–28. The first category encompasses "legal entities" such as corporations and partnerships. The second covers "any union or group of individuals associated in fact, although not a legal entity." There is no statutory provision that says that a single "enterprise" cannot consist both of so-called "legal entities" and "associations in fact." *See id.* at 580, 101 S.Ct. at 2527 ("no restriction upon the associations embraced by the definition."). Indeed, courts have found the existence of enterprises that are so constituted. For example, Judge Griesa in *United States v. Local 359* recognized that the Fulton Fish Market—a commercial center consisting of various wholesale seafood businesses and serviced by Seafood Workers Local 359 members—constituted a RICO enterprise. 705 F.Supp. at 897.

As in *Local 359,* the criminal enterprise here—the Waterfront—is an integrated market. Its participants consist of local unions, employers, union officials, and members of La Cosa Nostra. This Court holds that there is sufficient evidence of the existence of an association in fact among the ILA, the ILA locals, the Waterfront employers, and members of the Gambino and Genovese crime families so that the "Waterfront" properly can be characterized as a RICO enterprise.

## II.

## PATTERN OF RACKETEERING ACTIVITY

To satisfy the "pattern" requirement of RICO, the government must demonstrate that each defendant committed at least two acts of racketeering activity, "one of which occurred after the effective date of this chapter [October 15, 1970] and the last of which occurred within ten years (excluding any period of imprisonment) after the commission of a prior act of racketeering activ-

ity." 18 U.S.C. § 1961(5). The Supreme Court has stated that a plaintiff alleging a pattern of racketeering activity must demonstrate (1) that there is a "relationship" between the predicate acts and (2) that the predicates themselves amount to, or that they otherwise constitute a threat of, continuing racketeering activity. *H.J., Inc. v. Northwestern Bell Tel. Co.,* 492 U.S. 229, 241–43, 109 S.Ct. 2893, 2901–03, 106 L.Ed.2d 195 (1989). "It is this factor of *continuity plus relationship* which combines to produce a pattern." *Id.* at 239, 109 S.Ct. at 2900; *see also Sedima,* 473 U.S. at 496 n. 14, 105 S.Ct. at 3285 n. 14 (quoting with approval legislative history stressing the relevance of "continuity plus relationship" to the pattern requirement); *United States v. Minicone,* 960 F.2d 1099, 1106 (2d Cir.1992), *cert. denied,* — U.S. ——, 112 S.Ct. 1511, 117 L.Ed.2d 648 (1992); *United States v. Indelicato,* 865 F.2d 1370, 1381 (2d Cir.1989).

The Supreme Court has noted that the relatedness requirement is satisfied if the acts "have the same or similar purposes, results, participants, victims, or methods of commission or otherwise are interrelated by distinguishing characteristics and are not isolated events." *H.J., Inc.,* 492 U.S. at 240, 109 S.Ct. at 2901.[16] The Second Circuit recently elaborated upon the definition of "relatedness" by noting that the term embodies two different concepts: first, the racketeering acts must be related to each other (so-called "horizontal" relatedness); and second, the predicate acts must be related to the enterprise (so-called "vertical" relatedness). *Minicone,* 960 F.2d at 1106.

"Continuity" refers either "to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition." *H.J., Inc.,* 492 U.S. at 241, 109 S.Ct. at 2902. The Court also noted that "the threat of continuity is sufficiently established where the predicates can be attributed to a defen-

---

**16.** The Second Circuit has stated this same notion differently:

[A]n interrelationship among various acts, suggesting the existence of a "pattern," could be established in a number of ways: These

include proof of their temporal proximity or common goals, or similarity of methods, or repetitions.

*Indelicato,* 865 F.2d at 1382.

dant operating as part of a long-term association that exists for criminal purposes." *Id.* at 242–43, 109 S.Ct. at 2902. With regard to the proofs required to show relatedness and continuity, the Second Circuit has observed:

> In some cases both the relatedness and the continuity necessary to show a RICO pattern may be proven through the nature of the RICO enterprise. For example, two racketeering acts that are not directly related to each other may nevertheless be related indirectly because each is related to the RICO enterprise. The nature of the enterprise may also serve to show the threat of continuing activity. *Where the enterprise is an entity whose business is racketeering activity, an act performed in furtherance of that business automatically carries with it the threat of continued racketeering activity.* Even where the enterprise is legitimate, if the racketeering acts were performed at the behest of an organized crime group, that fact would tend to belie any notion that the racketeering acts were sporadic or isolated.

*Indelicato,* 865 F.2d at 1383–84 (emphasis added).

■ Though these standards may, in some cases, be difficult to apply,[17] in this case, where the breadth of the government's evidence of the Waterfront criminal enterprise is so overwhelming, the Court finds that the government has clearly sustained its burden of demonstrating a "pattern of racketeering." First, this Court believes that the government has demonstrated that the defendants' predicate acts are "related" to each other and to the "Waterfront" enterprise. The common thread running through the alleged acts of racketeering in this case is exploitation of the Waterfront enterprise by LCN figures and their ILA confederates through control of ILA Local 1588. The existence of the pattern is confirmed by the public report evidence and expert and fact testimony set forth above.

We also believe that the government offered sufficient evidence to support the conclusion that the predicate acts had the requisite continuity. The Supreme Court has noted that a RICO pattern may surely be established if the related predicates themselves involve "a distinct threat of long-term racketeering activity, either implicit or explicit." In the context of organized crime enterprises, the Second Circuit has noted that "continuity" may virtually be presumed. *Indelicato,* 865 F.2d at 1383–84. For, "the fact that an act is done at the behest of organized crime makes it likely that a pattern will continue." *District Council,* 778 F.Supp. at 760.

### III.

### THE PARTIES

■ In order to make out a RICO claim under § 1962(c), the government must prove that each defendant committed at least two acts in furtherance of the RICO enterprise. In RICO parlance, these are known as "predicate acts." Before we consider the predicate acts in detail, we will first summarize the various allegations against each defendant, and make some preliminary factual findings with regard to each defendant.

#### A. *Venero "Benny Eggs" Mangano*

Defendant Venero Mangano has had a long association with the Genovese crime family. He is presently the Underboss of the Genovese crime family. GX 3425 ¶ 20 (Declaration of Lenehan); Tr. 52–53 (Hyman) (identifying Mangano as a member of Genovese family). In 1981 and 1982, he was a Genovese Capo. In 1989, Mangano was convicted of extortion. *See United States v. Gigante, et al.* (E.D.N.Y.) (the "Windows Case").

The government alleges that Mangano committed the following predicate acts: (1) aiding and abetting multiple Hobbs Act extortions and Taft–Hartley violations in connection with the MOTBY scheme and

---

**17.** *See generally H.J., Inc.,* 492 U.S. at 251, 109 S.Ct. at 2906–07 (Scalia, J., concurring in judg- ment).

Local 1588, and (2) multiple Hobbs Act extortions of Local 1588 members' economic and democratic rights. *See* Amended Complaint ¶¶ 78, 80.[18]

Mangano did not participate in the trial: he neither called witnesses nor introduced any evidentiary exhibits.[19] He did, however, file a detailed memorandum of law opposing the government's amended proposed findings of fact and conclusions of law ("Mangano's Brief") in which he argues that there is insufficient evidence in the record to establish any liability for the claims asserted against him. Peppered throughout his Brief, Mangano includes his own proposed findings of facts.

### B. *Anthony Gallagher*

Defendant Anthony Gallagher is connected with several high level figures in the Genovese family. He was an associate of deceased Genovese family soldier John Di-Gilio. Gallagher was convicted of racketeering, racketeering conspiracy, and other offenses in connection with his participation in a scheme to skim money from slot machines in Atlantic City and Las Vegas. *State of New Jersey v. Gallagher,* Index 87–03–0365–ASG (N.J.Sup.Ct.).

Gallagher owned a number of Waterfront businesses, including Bar Bea Trucking, B & A Reefer, and Consolidated Pier Deliveries. As we will discuss below, these companies allegedly played an important part in the MOTBY scheme.

The government alleges that Gallagher committed the following predicate acts: (1) multiple Hobbs Act extortions and Taft–Hartley violations in connection with the MOTBY scheme and ILA local 1588; and (2) multiple Hobbs Act extortions of Local

1588 members' economic and democratic rights. *See* Amended Complaint ¶¶ 78, 80.

Gallagher was incarcerated during much of the trial in this case, and never obtained counsel.[20] Periodically the Court received written submissions from Mr. Gallagher. While the breadth of topics covered in Mr. Gallagher's submissions is impressive, many of the literally hundreds of pages submitted bore no apparent relation to proceedings before this Court. Mr. Gallagher's Proposed Findings of Fact and Conclusions of Law ("Gallagher's PFF & CL") are more or less in this vein.

### C. *Donald Carson*

From 1972 until 1988, Carson was the Secretary–Treasurer of Locals 1587 and 1588. Carson held the second highest posts in the International and District Council, as the ILA and ACD's Executive Vice–President.

The government alleges that defendant Donald Carson committed the following predicate acts: (1) multiple Hobbs Act extortions and Taft–Hartley violations in connection with the MOTBY scheme and ILA local 1588; (2) multiple Hobbs Act extortions of Local 1588 members' economic and democratic rights; (3) multiple Taft Hartley violations for unlawfully receiving meals and entertainment in connection with Local 1588; and (4) embezzlement of union funds (along with Lachnicht) in violation of 29 U.S.C. § 501(c). *See* Amended Complaint ¶¶ 78–80. *See also* this Court's Order dated July, 7, 1992 (amending complaint to include, inter alia, embezzlement claim against Carson).

Carson was also incarcerated during much of the trial.[21] During the course of

---

**18.** The government has apparently abandoned its claim, set forth in ¶¶ 76–77 of the complaint, that Mangano committed multiple Hobbs Act extortions of the economic and democratic rights of members of Local 1804–1, for no reference is made to this claim in the government's Amended Proposed Findings of Fact and Conclusions of Law.

**19.** Mangano explains that he did not present a defense in this case because he was simultaneously on trial in a criminal case in the Eastern District of New York and because he want-

ed to avoid the litigation expense. Mangano's Br. at 5.

**20.** Gallagher was incarcerated for convictions that were vacated on appeal. *See* Part IV.A.1, *infra* (discussion of *United States v. Carson,* 969 F.2d 1480 (3d Cir.1992)).

**21.** Carson was incarcerated for convictions that were vacated on appeal. *See* Part IV.A.1, *infra* (discussion of *United States v. Carson,* 969 F.2d 1480 (3d Cir.1992)).

the trial, and during pre-trial proceedings, Carson both represented himself *pro se* and was represented by counsel. Carson, through his attorney, submitted Proposed Findings of Fact ("Carson's PFF & CL") and a brief addressing the effect of the Third Circuit's decision in *United States v. Carson*, 969 F.2d 1480 (3d Cir.1992), on this case ("Carson's Tape Brief").

### D. *George Lachnicht*

For approximately three decades, defendant George Lachnicht was a longshoreman and vice president of Local 1588. From January 1972 until he retired in 1990, Lachnicht was employed as a hiring agent by Prolerized Shiabo Neu ("PSN") at Claremont Terminal, New Jersey. Throughout the period that he worked for PSN as a hiring agent, Lachnicht was Vice President of the local that supplied PSN with longshoremen. Lachnicht Dep. 116–118.

The Government alleges that defendant George Lachnicht committed the following predicate acts: (1) A Hobbs Act extortion of his "no-show" job from his employer; (2) multiple Taft–Hartley Act violations for accepting gifts from his employer; (3) Taft–Hartley, Wire Fraud Act, and Hobbs Act violations for illegally providing organized crime figures with "no-show" waterfront jobs; (4) Hobbs Act extortions and Taft–Hartley violations in connection with the MOTBY scheme and ILA local 1588; (5) multiple Hobbs Act extortions of Local 1588 members' economic and democratic rights; (6) Mail Fraud Statute Violations in conjunction with his filing of a false workers' compensation claim; (7) embezzlement of union funds (along with Carson) from Local 1588 in violation of 29 U.S.C. § 501(c). *See* Amended Complaint ¶¶ 78–80. *See also* this Court's order dated July 7, 1992 (amending complaint to include, inter alia, specific claims against Lachnicht).

Of the four remaining defendants, Lachnicht participated to the greatest extent at the trial. He also filed Proposed Findings of Fact and Conclusions of Law ("Lachnicht's PFF & CL").

### IV.

### THE PREDICATE ACTS

### A. The MOTBY Predicate Acts

The government alleges that three of the remaining four defendants—Carson, Gallagher, and Mangano—participated in what it designates the "MOTBY scheme." The MOTBY scheme occurred at the Military Ocean Terminal at Bayonne, New Jersey, and formed the basis for the criminal RICO convictions of defendants Carson and Gallagher in New Jersey. *See United States v. DiGilio*, 86 Cr. 340 (DRD) (D.N.J.).[22] Originally, the government had intended to rely on those prior convictions as res judicata to establish one or more of the predicate acts in this civil RICO lawsuit. However, in *United States v. Carson*, 969 F.2d 1480 (3d Cir.1992), the Third Circuit vacated Carson and Gallagher's convictions, holding that 108 of the government's surveillance tapes must be suppressed for failure to seal them in a timely manner in accordance with the federal wiretapping statute, 18 U.S.C. § 2510, *et seq.* The case was remanded to the district court to determine the sufficiency of the remaining evidence.

The government has abandoned its efforts to reinstate Carson and Gallagher's convictions, and the indictments were dismissed in January of 1993. Obviously, the government can no longer rely on Carson and Gallagher's criminal convictions as res judicata.

The *Carson* opinion raises a second problem: many of the surveillance tapes that were suppressed by the Third Circuit had

---

**22.** Carson and Gallagher were convicted of conspiracy in violation of 18 U.S.C. § 1962(d) in conducting the affairs of the "John DiGilio Group" through a pattern of racketeering manifested by the payment of money by United Terminals, Inc., a stevedoring company, and its receipt by Carson, an official of the ILA in violation of the Taft–Hartley Act, 29 U.S.C.

§ 186. Carson and Gallagher were also convicted of conspiracy to extort money from United Terminals, Inc., in violation of the Hobbs Act, 18 U.S.C. § 1951. A third defendant, John DiGilio, was acquitted of all charges in this case. His body washed ashore a few months later, riddled with bullet holes.

been admitted as evidence in this civil RICO action. In response to the Third Circuit's opinion, the government submitted Amended Proposed Findings of Fact and Conclusions of Law which omitted any reference to the tapes that were suppressed. In addition, the parties briefed the issue of the effect of the Third Circuit's opinion in this case. The government contends that even without the suppressed tapes, it can still prove by a preponderance of the evidence that Carson, Gallagher, and Mangano participated in the MOTBY scheme.

Therefore, this Court will make factual findings with regard to the alleged MOTBY scheme, without reference to the suppressed surveillance tapes.

Before discussing the complicated structure of the MOTBY scheme, it might be useful to summarize, in broad strokes, the government's allegations. The government contends that defendants Carson, Mangano, and Gallagher, along with LCN co-conspirators, used threats of labor unrest to extort money from United Terminals, Inc. ("UTI"), a Bayonne stevedoring firm that employed members of Local 1588. This scheme involved the use by UTI of ILA warehouse workers rather than more highly paid deep-sea workers as contracted for by a shipper that utilized UTI's services (Sealand Services, Inc.) and as was required by ILA policy. Some of the money that UTI saved by using the cheaper work force—which the government claims exceeded one half million dollars—was allegedly retained by UTI officials and some was siphoned out of UTI by the Genovese Family at a rate of $25 for each container "stripped" at the MOTBY facility. The cooperation of Local 1588 in the MOTBY scheme was allegedly obtained by paying off Local 1588 boss Donald Carson: in return for a share of the MOTBY kickbacks, the government alleges that Carson acquiesced to the use of lower paid warehouse labor in violation of ILA policy. This "shakedown" was allegedly enforced by the threat of labor troubles.

After careful consideration of all of the evidence in the record, this Court concludes that the government has proved the existence of the MOTBY operation, at least in the sense that the defendants, together with others, defrauded Sealand Services, Inc. and profited thereby. We do not believe, however, that the government has demonstrated by a preponderance of the evidence that the MOTBY scheme constituted an "extortion" as that term is defined in the Hobbs Act. We further conclude that, through the MOTBY scheme, Carson received payments in violation of Taft–Hartley, and that Gallagher and Mangano aided and abetted Carson's Taft–Hartley violations.

*Findings of Fact*

Sealand Service, Inc. ("Sealand") is an international shipping company that moves containerized cargo worldwide. Cargo imported from the far east is shipped by rail from the west coast to various east coast destinations. At the east coast sites, a stevedoring company employed by Sealand "strips" [23] the containers, temporarily stores the contents, and then arranges with consignees to pick up the unloaded merchandise.

In 1981, Sealand operated this type of container stripping business at Shed 138 at Port Newark, New Jersey. Tr. 3775 (Blickstein); Tr. 3932, 3939 (Mickey). Sealand's contractual stevedore was United Terminals, Inc. ("UTI"). All of the stripping and "stuffing" [24] work at Port Newark was performed by deep-sea longshoremen who were members of the ILA Local in Port Newark, in accordance with ILA policy and with the contract between UTI and Sealand. GX 3411 at 1926–27 (Scott testimony).

In 1981, the Port Newark operation at Shed 138 had to be relocated because the shed, owned by the Port Authority, was scheduled to undergo extensive repairs.

---

**23.** "Stripping" means unloading of cartons from the vessel. Tr. 3933, 3938 (Mickey).

**24.** "Stuffing" means the loading of cartons onto the trucks of consignees who come to pick up the merchandise.

GX 3411 at 1920, 1927, 2061 (Scott); GX 603 DIG (Sealand interoffice memorandum). Sealand considered several alternative sites but ultimately decided to relocate its operations from Port Newark to the Military Ocean Terminal in Bayonne ("MOTBY").

MOTBY is a Government-owned port facility which is used primarily to handle military cargo. At some time prior to 1981, the government had leased thirty-three acres of MOTBY to Consolidated Pier Deliveries ("CPD") for commercial use.[25] CPD was controlled by defendant Anthony Gallagher. UTI subleased from CPD a building located within the thirty-three acre commercial portion of MOTBY leased to CPD.[26] Tr. 3781–82 (Blickstein). This building was known as "Building 13." UTI continued to act as Sealand's stevedore after its move to MOTBY in June of 1981. GX 3411 at 1957–58, 2039.

There are two different classes of laborers that are commonly used on the waterfront to load and discharge cargo ships: warehousemen labor and deep-sea labor. In Bayonne, the deep-sea longshoremen are members of Local 1588, and the warehousemen are members of Local 1587. During the period in question, both locals were run by defendant Donald Carson. The critical difference between these two classes of longshoremen, for the purposes of this lawsuit, is that warehousemen are paid significantly less (i.e., five dollars an hour less and lesser fringe benefits) than deep-sea laborers.[27] Also critical is the fact that at all times during the existence of the alleged scheme, ILA policy required that deep-sea labor be used for loading and discharging of ocean going vessels and opposed the use of mixed labor at pier facilities. The use of a "mixed labor" force at MOTBY was unprecedented.

By contract, Sealand agreed to pay UTI for its stevedoring services at a price based on the higher deep-sea wages. GX 3411 at 2056–57 (Scott testimony). Although this agreement was to remain unchanged after UTI moved to MOTBY, the evidence presented during the trial demonstrated that UTI violated this contract after its move to MOTBY. UTI president David Richman arranged with Donald Carson, the Secretary–Treasurer of the ILA's two locals in Bayonne, to use cheaper "warehousemen" labor for a major portion of the MOTBY operation instead of deep-sea longshoremen. GX 1 DIG (contract between Local 1587 and UTI).

Under Carson's arrangement with UTI, warehousemen were used to strip the containers and place the goods in Building 13. The deep-sea longshoremen merely loaded the merchandise onto the trucks of consignees who came to pick up their merchandise. Because the warehousemen were paid approximately five dollars less per hour than the ILA deep-sea longshoremen—not including fringe benefits—UTI saved a total of $546,000 during the fifteen month period of MOTBY operation. This estimate does not reflect the amount saved in overtime payments.

The MOTBY operation began in June 1981 and continued through September 1982. Throughout this period, UTI continued to bill Sealand for labor costs at the higher deep-sea longshoremen rate.

UTI retained approximately $370,000 of the extra profit for itself.[28] The government claims Gallagher, Carson, and Mangano each received a payoff in return for their participation in the scheme. We will separately consider the evidence presented by the government that each defendant participated in and profited from the MOTBY scheme.

---

**25.** The government alleges that CPD was controlled by Gallagher and that Mangano had a "beneficial interest" in CDP. We will address that issue below. See Part IV.A.2 infra.

**26.** The commercial area was physically separated from the military area by fences and was operated as a separate entity by CPD.

**27.** The difference in wages and benefits was the result of the fact that ILA warehousemen were not covered by the master contract. Tr. 3935–36 (Mickey).

**28.** The government arrives at this number by subtracting the sum given to Gallagher (approximately $175,000), see discussion infra, from its estimate of the amount saved by UTI ($546,000).

#### 1. Gallagher

Gallagher played an instrumental role in the MOTBY operation. First, he was the primary lessor of the MOTBY commercial property from the government. As noted above, he subleased Building 13 to UTI.

Second, the government offered overwhelming proof that Gallagher used his company B & A Reefer to siphon off a portion of the money UTI saved by using the cheaper warehousemen labor (the "MOTBY profits"). Between June 1981, and September 1982, B & A Reefer submitted weekly bills to UTI for services supposedly rendered within the MOTBY facility, specifically, for moving containers.[29] Tr. 3883 (Ruffino). B & A Reefer billed UTI at a rate of $27.50 per container move. The evidence demonstrates that none of the container moves ever took place and that the B & A Reefer bills were for fictitious services:

First, Sealand had previously contracted with Bar–Bea Truck Leasing Company, Inc. ("Bar–Bea")—another company controlled by Gallagher—to move its containers. GX 3411 at 67, 1980, 1996, 1997–98 (Scott testimony); Tr. 3930 (Mickey). Bar–Bea performed this work and submitted bills to Sealand which were paid.

Second, the Court credits the testimony of Joseph Mickey, UTI's terminal manager who supervised the stripping operation. Mickey stated that B & A Reefer never provided any services to UTI at the MOTBY Sealand operation. Tr. 3945, 3987–88 (Mickey).

Third, the Court notes that the B & A Reefer invoices contained no back-up documentation for the services supposedly rendered by B & A Reefer.[30]

Fourth, the Court finds it highly suspect that UTI's normal 30- to 60-day billing cycle was ignored for the "bills" from B & A Reefer. Instead, the B & A Reefer bills were always paid by check on the same day that they were submitted. Tr. 3885–86 (Ruffino);

Finally, and perhaps most damning, the false invoices submitted to UTI by B & A Reefer were accounted for on UTI's profit and loss statements for MOTBY as "extra equipment" or "rent" and not as container moves. Tr. 3792–96 (Blickstein). This was so even though no "extra equipment" was ever provided to UTI by B & A Reefer or by Gallagher. Indeed, Joseph Mickey testified that Gallagher provided UTI with the figures to include as "extra equipment" in its profit and loss statement on a weekly basis. Tr. 3949–53 (Mickey).

In total, Gallagher, through B & A Reefer, received UTI checks totalling $175,800 during this period.[31] The government alleges that Gallagher then shared the money he received from UTI with various Genovese family co-conspirators, including Mangano and Carson. Govt's PFF & CL ¶ 60. The Court will next consider the role that Carson and Mangano allegedly played in the scheme, including whether they received kickbacks from Gallagher.

**29.** B & A Reefer billed UTI at a rate of $27.50 per container move.

**30.** Special Agent Rosario Ruffino compared the invoices for both Bar–Bea and B & A Reefer and testified:

Q. Can you compare those invoices for us? What are the similarities and differences?
A. There are obvious differences on the face. On the Bar–Bea invoice the container numbers shipped in the MOTBY facility were listed. On B & A Reefer there were no container numbers listed on those invoices.
The other thing that comes to mind would be the invoices for Bar–Bea Truck Leasing that were sent over to Sealand and paid by Sealand had backup documentation. There were trailer inspection reports, ... drivers picking up the cartons and signing for them, other documents which would support the ... invoice.
In B & A Reefer's case all I saw there when I examined it was just an invoice, no container moves were indicated on the invoice, and no documentation at all.
Tr. 3882–83 (Ruffino).

**31.** Checks totalling $115,000, representing billings from approximately November 1981 to September 1982, were cashed immediately by check cashing companies. Checks totalling $60,800, representing billings from approximately June 1981 to November 1981, were deposited into B & A Reefer's bank account at the Commercial Trust Company in New Jersey. Tr. 3887–88 (Ruffino).

2. Mangano

The government alleges that (1) Mangano loaned money to Gallagher for the MOTBY operation and consequently had an ownership interest in Gallagher's company CPD which held the underlying lease on the facility at MOTBY; (2) that he intended to assist Gallagher in the criminal scheme; and (3) that he in fact received payoffs. Govt's PFF & CL ¶ 60, 68. *See also* Govt's Memorandum in Opposition to Venero Mangano's Request for Summary Judgment at 8–13. We consider each of these allegations in turn.

The evidence demonstrates that Gallagher obtained substantial financial assistance from Mangano which enabled him to put up the bid necessary to win the lease of the property at MOTBY.[32] Gallagher testified at his deposition that Mangano contacted Kenneth Feldman, the owner of a company known as Venture Capital Lending, and "recommended" that he loan Gallagher approximately ninety thousand dollars as "working capital" for the operation. Gallagher Dep. at 41.[33] Gallagher also testified that Mangano acted as a guarantor for loans Gallagher took out during the period in which the MOTBY scheme was in operation. *Id.* at 37. Further, when asked if Mangano had ever lent him money, Gallagher responded, "[m]any, many times." *Id.* at 36. Gallagher discussed one specific instance when Mangano, while incarcerated, loaned Gallagher's company, Bar–Bea Trucking, twenty thousand dollars as "working capital." *Id.* 44–46.

In return for this assistance, the government alleges Mangano received what it describes as a "beneficial interest" in Gallagher's company CPD. Govt's PFF & CL ¶ 43. The most compelling evidence to support this contention is testimony from Gallagher himself.[34] *See* Gallagher Dep. at 54.5–16. The relevant portions of the testimony reads as follows:

Q. Did Mr. Mangano ever have any interest, beneficial, legal, equitable interest of any nature in any of your business?

A. I would say yes. I would say that he and Irving Held—that I—I mean, they didn't have anything, they weren't aware. But I think he and Irving Held, I had determined that they would share if CPD became successful. So I always said they had a beneficial interest in it or a contingent interest in it. I would tell people that. It never came to pass, unfortunately. Irving died, and the government destroyed CPD, so that ended.

*See* Gallagher Dep. at 54.5–16.

Although the government does not detail what it means by a "beneficial interest," the Court understands the government to mean an actual ownership interest in CPD, and not merely a "claim" to a portion of the kickbacks Gallagher was extracting from UTI. As such, we believe that there is simply not enough evidence in the record to support the government's contention. Gallagher's testimony is, at best, ambiguous; indeed, he explicitly says that Mangano and Held *"didn't have anything, they weren't aware."* We agree with Mangano

---

**32.** Gallagher also borrowed money from Irving Held, a businessman who was convicted in UNIRAC for making labor payoffs to organized crime-controlled ILA officials and who had been barred from doing business on the Waterfront by the Waterfront Commission. Gallagher Dep. at 30, 134–135.

**33.** By letter dated August 10, 1992, Assistant United States Attorney Chad A. Vignola requested that the Court designate as part of the record an additional fifteen pages of the Gallagher deposition. No party objected. As a consequence, the following additional pages of the Gallagher deposition were designated as included in the record: 31–33, 36, 37, 39–41, 44–46, 52, 54–56.

**34.** As further support for this contention, the government also cites two other sources: (1) the direct examination testimony of Edward H. Blickstein, who in 1981–1982 was an executive for Diversified Transportation Resources, the parent company of UTI; and (2) the testimony of Joseph Mickey, the terminal manager for UTI. However, Blickstein and Mickey's testimony does not support the allegation that Mangano had a "beneficial" interest in CPD. *See* Tr. 3781–82 (Blickstein); Tr. 3931–32, 3951 (Mickey). Neither Blickstein or Mickey link Mangano with CPD; they merely testified that CPD held the underlying lease at MOTBY.

that this passage at most supports a finding that Mangano unknowingly had a "contingent beneficial interest" in CPD which merely meant that Gallagher had determined in his own mind that if CPD ever succeeded Gallagher would give Mangano an interest.

The Court concludes that there is sufficient evidence in the record from which the Court may draw the reasonable inference that when Mangano provided Gallagher with financial assistance, he knew of Gallagher's criminal scheme and intended to assist Gallagher.

First, and most importantly, the government offers direct evidence that Mangano received a share of the MOTBY profits. At his criminal trial, and under oath, Gallagher confessed that on January 3, 1981, he attended an "important" meeting with Barbato and DiGilio at DiGilio's office above Local 1588 which Barbato convened in order to question Gallagher and DiGilio concerning the MOTBY operation. At this meeting, Gallagher told Barbato that "Benny Mangano" made a division of "$25 a container", payments which were allocated to "$5" shares which went to Mangano, Carson, and others. This statement was admitted in this trial without objection as GX 5592A at 9772.

■ Mangano now objects to this evidence on hearsay grounds. We believe that Mangano waived any hearsay objection he may have had long ago. Mangano was advised of the government's intention to offer this evidence on December 3, 1991. Declaration of Chad A. Vignola, dated September 10, 1992, ¶ D(4) & Exhibit Q. Mangano did not respond to the government's notice. *Id.*, ¶ D(4). On December 30, 1991, the government informed the Court and Mangano that the Court had yet to rule on the admissibility of Gallagher's criminal trial testimony. *Id.*, ¶ D(5) & Exhibit U. Again, Mangano raised no objection. *Id.*, ¶ D(5). On January 2, 1992, the Court received the transcript in evidence without objection. *Id.*, ¶ D(6), Exhibit Y. *See* Tr. 5611. We therefore reject Mangano's belated hearsay objection and credit this confession as direct evidence that Mangano

received a share of the MOTBY profits and, inferentially, that he knowingly assisted Gallagher in the MOTBY operation.

We also believe that there is other circumstantial evidence that permits the reasonable inference, which we draw, that Mangano assisted Gallagher because Mangano expected to be compensated for his participation in the scheme.

First, we believe that it is proper for the Court to give some weight to the fact that the participants in the MOTBY scheme—including Mangano, Carson, and Gallagher—were closely associated with organized crime when determining whether Mangano knew of and intended to assist the criminal operation at MOTBY. Specifically, it is proper to consider the fact that at the time of the MOTBY scheme, Mangano was a Genovese Capo and therefore, by LCN tradition, had a "claim" on all money that family members and associates supervised by him made through their operations. Expert testimony regarding the structure and practices consequent to membership in an organized crime family is admissible "to furnish an explanation of the understanding or intent with which certain acts were formed." *United States v. Daly*, 842 F.2d 1380, 1388 (2d Cir.), *cert. denied*, 488 U.S. 821, 109 S.Ct. 66, 102 L.Ed.2d 43 (1988).

Second, the Court draws an adverse inference against Mangano because of his failure to call any witnesses on his own behalf or adduce any evidence.

Finally, this Court concludes that evidence showed that Mangano continued to receive a share of the MOTBY profits even while he was incarcerated. The evidence demonstrated that Barbato, a member of Mangano's crew, supervised the MOTBY scheme on Mangano's behalf while Mangano was incarcerated. In an intercepted conversation between John Barbato and John DiGilio, Barbato complained to DiGilio of his trouble collecting from Gallagher MOTBY payments owed to Mangano. G–105–AA DIG at 2. We agree with the government that this conversation tends to prove that Barbato was supervising Man-

gano's monetary interest in MOTBY while Mangano was incarcerated.

### 3. Carson

As noted above, the ILA's official policy prohibited the use of mixed labor forces— like the one employed by UTI—at pier facilities. Notwithstanding this long standing prohibition against mixed labor, Carson, the union local's Secretary–Treasurer, signed a contract allowing UTI to use the mixed labor force. GX 1 DIG (labor contract). Without Carson's assistance, the MOTBY scheme would have been impossible.

Carson attempted to cover-up his violation of ILA policy and his participation in the criminal MOTBY operation. Carson lied to the NYSA–ILA Container Fund Inspectors who were sent in response to an anonymous letter complaint to the ILA. Carson explicitly denied that such a mixed labor force was utilized at the MOTBY operation. Carson also lied to International President Teddy Gleason, denying that UTI used mixed labor.

The confession of Anthony Gallagher, which is discussed in detail above, provides direct evidence that Carson received $5 per container in return for the role he played in the MOTBY operation.

The government contends that Carson's receipt of payoffs from Gallagher is further evidenced by the so-called "Tony G" List. This document, in Carson's handwriting, was found in the room next to Carson's bedroom during an FBI search. GX 3902 at 3832–33 (Varnum testimony). Though not entirely legible, the "Tony G" List contains three columns, two with dates, one with numbers. The three columns are reproduced in the margin.[35]

According to the government, the seven figures in the second column represent the amount of money that Carson received from Gallagher, on each of the seven dates specified in the third column, in return for his participation in the scheme. These amounts total exactly $2,275. UTI records indicate that exactly 455 containers were stripped by UTI at MOTBY between June 1981 and August 3, 1981. The government points out that $2,275 divides perfectly by 455 into $5. The government contends that, based on these calculations, it is reasonable to infer that the "Tony G" list is a record of Carson's $5 per container share of the payoff received by Gallagher from UTI for June through August 3, 1981.

Before we reach the evidentiary value of the "Tony G" List, we must first address the question of its admissibility. Carson argues that the "Tony G" List should be suppressed as "fruit" of the surveillance tapes that were suppressed for failure to seal in a timely fashion under the federal wiretapping statute.[36] *See* Response of Carson to Government's Post–Trial Memorandum Concerning the Belatedly Suppressed Tapes ("Carson's Tape Brief") at 12–16. The government apparently concedes that the "Tony G" List was seized pursuant to a search warrant supported by probable cause established, in part, by the suppressed surveillance tapes. Government's Post Trial Memorandum Concerning the Suppressed Electronic Surveillance Tapes ("Govt's Tape Memo.") at 8. The issue this Court must determine is whether the "Tony G" List should be suppressed because it was derived from a wiretap that was unlawful for lack of prompt sealing.

The Court notes at the outset that this question is largely academic, for the government offered *direct* evidence which, standing alone, proves by a preponderance of the evidence that Mangano arranged for a division of the $25 per container payments pursuant to which $5 shares went to Mangano, Carson, and others. *See* GX 5592A at 9772 (Gallagher confession). The admission of the "Tony G" List is largely gilding the lily.

---

**35.** The "Tony G" List looks something like this:

| | TONY G | |
|---|---|---|
| JUNE | 640 | * |
| JUNE | 375 | 6/29/81 |
| JULY | 190 | 7/7/81 |
| JULY | 230 | 7/14/81 |
| JULY | 315 | 7/21/81 |
| " | 285 | 7/29/81 |
| AUGUST | 240 | 8/5/81 |

GX 811 DIG.

**36.** *See* note 8, *supra.*

■ In any event, this Court believes that under controlling precedent, the "Tony G" List should not be suppressed. The parties cite two relevant Second Circuit cases. In *United States v. Fury*, 554 F.2d 522, 532 (2d Cir.1977), *cert. denied*, 436 U.S. 931, 98 S.Ct. 2831, 56 L.Ed.2d 776 (1978), the Second Circuit held that surveillance tapes that are suppressed because of a delay in sealing—under a New York statute modeled on the federal statute—may be used to establish probable cause to support the issuance of a second wiretap order. In *United States v. Donlan*, 825 F.2d 653, 655–56 (2d Cir.1987), the Second Circuit examined the statutory language and legislative intent behind the federal wiretapping statute and explicitly held that 18 U.S.C. § 2518(8)(a)[37] did not bar the admission of evidence obtained in a search made on the basis of information learned through the suppressed tapes.[38] *See also* § 2517(2); *United States v. Ricco*, 566 F.2d 433, 435 (2d Cir.1977) ("Use permitted by § 2517(2) is not subject to the strictures of § 2518(8)(a)"), *cert. denied*, 436 U.S. 926, 98 S.Ct. 2819, 56 L.Ed.2d 768 (1978). The *Donlan* court stated:

> [T]he prohibition in subsection 2518(8)(a) on derivative use at trial of improperly sealed tapes in not to be applied strictly to prohibit use of all evidence that can be connected through a chain of causation to a wiretap tainted by improper sealing of the tape.

*Donlan*, 825 F.2d at 657.[39]

We believe that these two precedents are controlling. We are not persuaded, as Carson argues, that the Supreme Court's most recent pronouncement on the sealing requirement of § 2518(8)(a) sheds any doubt on the viability of these two cases. In *United States v. Ojeda Rios*, 495 U.S. 257, 264–67, 110 S.Ct. 1845, 1853–55, 109 L.Ed.2d 224 (1990), the Supreme Court held that the suppression of tapes derived from an authorized electronic surveillance is required where the government is unable to offer a "satisfactory explanation" for a delay in sealing the tapes in accordance with 18 U.S.C. § 2518(8)(a). The Court did not address whether suppressed tapes could be used to develop leads and probable cause to obtain other evidence. The Third Circuit has recognized that *Ojeda Rios* left this an "open issue." *See United States v. Vastola*, 915 F.2d 865, 876–77 n. 19 (3d Cir.1990) (reserving decision on whether court must suppress "fruits" of tapes suppressed because of untimely sealing), *cert. denied*, —— U.S. ——, 111 S.Ct. 1073, 112 L.Ed.2d 1178 (1991); *Carson*, 969 F.2d at 1500 (acknowledging same).

Therefore, in the absence of indications to the contrary from the Supreme Court, this Court is bound by Second Circuit precedent to hold that the "Tony G" List was properly admitted and is properly part of the record in this case. In addition, the Court is persuaded by the precision of the arithmetic calculations that the "Tony G" List is a record of the amounts that Carson received, or expected to receive, for his part in the MOTBY scheme.[40]

---

**37.** Section 2518(8)(a) provides, in pertinent part:
The presence of the seal provided for by this subsection, or a satisfactory explanation for the absence thereof, shall be a prerequisite for the use or disclosure of the contents of any wire, oral, or electronic communication *or evidence derived therefrom* under subsection (3) of section 2517.
18 U.S.C. § 2518(8)(a) (emphasis added).

**38.** In *Donlan*, Drug enforcement agents relied on information learned during an intercepted conversation to stop the defendant's car. As a result of the stop, the agents seized evidence and heard the defendant make incriminating statements. Although the tapes were suppressed on the ground that the sealing was unjustifiably delayed, the evidence "derived" from the tapes was held admissible.

**39.** The court also states that "[w]hether 'derived' in subsection 2518(8)(a) would also cover evidence mentioned in tainted interceptions and found at a location mentioned in such interceptions need not now be considered." *Donlan*, 825 F.2d at 657. There is no indication in the record that the "Tony G" List came to the attention of the government in such a manner.

**40.** Were the "Tony G" List the only evidence that the government presented with regard to this issue, it would be a close question whether the government had sustained its burden. However, as noted above, Gallagher's confession is

*Conclusions of Law* [41]

1. The Hobbs Act Extortion of UTI [42]

 The government first alleges that Gallagher, Carson, and Mangano extorted money from UTI in violation of the Hobbs Act, 18 U.S.C. § 1951. In order to establish a violation of the Hobbs Act, the government must show that (1) the defendant received the property of another without lawful claim to such property; (2) the alleged victim made the payments because of "actual or threatened force, violence or fear"; and (3) the defendant had an intent to exploit the alleged victim's fear. [43] *United States v. Clemente*, 640 F.2d 1069, 1076 (2d Cir.), *cert. denied*, 454 U.S. 820, 102 S.Ct. 102, 70 L.Ed.2d 91 (1981).

 After carefully considering the evidence, this Court concludes that the government has failed to produce any evidence of the use of "actual or threatened force, violence, or fear" against UTI. The government contends that the "shakedown" was enforced by threats of labor unrest. However, there was no evidence in the record of a direct or indirect threat against UTI, nor is there evidence that would indicate that UTI was in fear of labor unrest if it did not pay money to Carson, Gallagher, and Mangano. Indeed, the record reflects that UTI actually received the largest share of the MOTBY profits—a fact which makes it seem more likely that UTI was a participant in the MOTBY scheme rather than an unwilling victim. Thus we find that the government has failed to sustain its burden of proof of a "shakedown" enforced by the threat of labor troubles.

2. Taft–Hartley

a. *Carson*

The Court believes that the government has demonstrated by a preponderance of the evidence that Carson received payments in violation of the Taft–Hartley Act, 29 U.S.C. § 186(b).

Congress enacted the National Labor Relations (Taft–Hartley) Act of 1947 to prevent bribery of union officials by employers and extortion of employers by union officials. *See Arroyo v. United States*, 359 U.S. 419, 424–26, 79 S.Ct. 864, 867–69, 3 L.Ed.2d 915 (1959); *BASF Wyandotte Corp. v. Local 227, International Chemical Workers Union*, 791 F.2d 1046, 1050–51 (2d Cir.1986). Section 302 of the Taft–Hartley Act, as amended, provides in pertinent part:

> It shall be unlawful for any employer ... or any person who acts ... in the interest of any employer, to pay, lend or deliver ... any money or other thing of value—
>
> (1) to any representative of any of his employees who are employed in an industry affecting commerce; or
>
> (2) to any labor organization, or any officer or employee thereof, which represents, seeks to represent, or would admit to membership, any of the employees of such employer who are employed in an industry affecting commerce....

29 U.S.C. § 186(a). Section 302(b) makes it unlawful for any person to "request, demand, receive, or accept" any money or other thing of value prohibited by subsection (a). 29 U.S.C. § 186(b). Statutory exceptions to subsections (a) and (b) are set forth in subsection (c). 29 U.S.C. § 186(c).

 Union officers are strictly liable for accepting payments in violation of Taft–Hartley. In addition, it is unneces-

---

direct evidence that Carson and Mangano received $5 per container move.

**41.** In its Amended Complaint, the government had alleged that Carson, Gallagher, and Mangano committed multiple violations of the Travel Act, 18 U.S.C. § 1952 in connection with the MOTBY scheme. We assume that the government has abandoned these claims since it did not include proposed findings of fact or conclusions of law with regard to the Travel Act.

**42.** We defer consideration of the government's claim that the defendants committed multiple Hobbs Act extortions of the *Local 1588 members'* economic and democratic rights until Part IV.D.2, *infra*.

**43.** There is also a jurisdictional requirement that the extortion affect or obstruct interstate commerce, but that element is not in contention here.

sary "for the government to prove the employers' guilt as a predicate to [the union official's]. It [is] enough to show that the employer paid, lent, or delivered [the thing of value] and that [the union official] accepted [it]." *United States v. Cody*, 722 F.2d 1052, 1059 (2d Cir.1983), *cert. denied*, 467 U.S. 1226, 104 S.Ct. 2678, 81 L.Ed.2d 873 (1984). Moreover, the union officer's purpose in receiving a payment from an employer, as well as the employer's purpose in making the payment, are irrelevant because all such payments—aside from those expressly excluded by the statute itself—are unlawful.

■ We conclude that the government proved multiple violations of Taft–Hartley. First, the evidence demonstrates that Carson received payments from UTI in the form of kickbacks in the amount of $5 per container stripped. Second, it is undisputed that UTI employs members of Local 1588. Third, Carson knew he was receiving payments from UTI. Finally, there is no dispute that Carson was an "officer" of Local 1588.[44] *Id.* at 1059–60.

b. *Gallagher and Mangano*

The Court also concludes that the government has demonstrated by a preponderance of the evidence that Gallagher and Mangano aided and abetted Carson's violation of the Taft–Hartley Act, 29 U.S.C. § 186(b).

■ In a civil RICO suit, the Court applies the criminal standard in determining aiding and abetting liability. *Local 560*, 780 F.2d at 284; *District Council*, 778 F.Supp. at 748. The Second Circuit has stated the elements of aiding and abetting as follows:

To convict a defendant of aiding and abetting the government must prove (1) commission of the underlying crime, (2) by a person other than the defendant, (3) a voluntary act or omission by the person charged as an aider and abettor, with (4) the specific intent that his act or omission bring about the underlying crime.

*United States v. Zambrano*, 776 F.2d 1091, 1097 (2d Cir.1985) (citations omitted).

■ As we noted above, the evidence demonstrates that Donald Carson committed multiple violations of the Taft–Hartley Act. The evidence also overwhelmingly demonstrates that both Mangano and Gallagher committed voluntary acts with the specific intent to bring about the underlying crime. As the findings of facts outlined above indicate, were it not for the joint cooperation of each of these three defendants, the MOTBY scheme could not have succeeded. We also believe, and have noted above, that both Mangano and Gallagher intended that their acts would bring about the underlying crime, *i.e.*, inter alia, the payment to Carson of his share of the MOTBY proceeds. Therefore, the government has demonstrated that the defendants aided and abetted Carson's numerous Taft–Hartley violations.

B. Carson's Acceptance of Meals and Entertainment & Solicitation of Contributions

As further predicate acts, the government contends that Donald Carson committed multiple violations of the Taft–Hartley Act, 29 U.S.C. § 186(b) by (1) accepting meals and entertainment from employers of ILA labor; and (2) unlawfully soliciting contributions to non-jointly administered union accounts. We conclude that the government has proved by a preponderance of the evidence that Carson accepted meals and entertainment, but that it has failed to demonstrate that Carson unlawfully solicited contributions. We will consider each claim separately.

A. *Meals and Entertainment*

■ The government's evidence that Carson accepted meals and entertainment from employers of ILA labor consisted principally of Waterfront Commission audit reports. *See* GX 2280 (Waterfront Commission audit reports). Marvin Weissman, the Waterfront Commission's chief accountant, testified that the Commission accountants audit stevedores and shipping compa-

---

**44.** We also conclude that none of the statutory exceptions are applicable.

nies every two or three years. Tr. 1423 (Weissman). These audits follow well-established procedures, and require the auditors to examine general ledgers, vouchers, and other documentation. Tr. 1424. Among the items Commission accountants are trained to examine are travel and entertainment records for the companies. Tr. 1425. This Court credits these audits.

After examining these audit reports, we conclude that they indicate that various employers of ILA labor made payments on behalf of Carson for meals and entertainment.

The Taft–Hartley Act makes it unlawful for any labor representative or union officer or employee to "request, demand, receive, or accept ... any money or thing of value" from an employer. 29 U.S.C. § 186(b). The statutory prohibition is *malum prohibitum,* and outlaws all payments, including classic monetary bribes or more subtle forms of employer payments. *United States v. Ryan,* 350 U.S. 299, 305, 76 S.Ct. 400, 404–05, 100 L.Ed. 335 (1956). The statute has specifically been held to proscribe the receipt by union officers of meals. *See, e.g., Butchers' Union, Local No. 498 v. SDC Investment, Inc.,* 631 F.Supp. 1001, 1003 (E.D.Cal.1986) (reimbursements for hotel, meals, and automobile expenses). We therefore conclude that Carson's acceptance of meals and entertainment from employers of ILA labor violated Taft–Hartley.

Donald Carson argues that the records are uncorroborated. Carson's PFF & CL ¶ 41. As an initial matter we note that Carson failed to challenge the accuracy of the Waterfront Commission audit reports when they were first introduced against him at trial. Moreover, as we have noted above, audit reports are generally supported by back-up documentation, and Waterfront Commission procedures require further verification. Carson also argues that the audits are "inherently unreliable because their authors had a motive to falsify expense account claims in order to enrich themselves." *Id.* Carson contends that the waterfront employees who submitted the expense account claims did so in order to get a business expense deduction. This Court disagrees. Someone seeking to disguise a purely personal expense as a business expenditure can readily do so without using a union official as the pretext, and thereby risking involvement in still another violation of law.

Carson also argues that since he was authorized to charge meals involving Local business on an account issued to the Local, the fact that he allowed Waterfront employers to pay actually saved the Local money, and provided no tangible benefit to him. Carson's PFF & CL ¶ 42. Again, even if we accept Carson's statement at face value, the statute still prohibits Carson's acceptance of meals.

Nor are we persuaded that the meals are of *de minimis* value. As the record amply demonstrated, Carson *repeatedly* received meals, often valued in the hundreds of dollars.

**B.** *Unlawful Solicitation of Contributions*

We consider next the government's allegation that Carson unlawfully solicited contributions to non-jointly administered union accounts in violation of the Taft–Hartley Act. Again the government's proof consists of Waterfront Commission Audit reports which indicate that various waterfront employers purchased tickets to various "functions" sponsored by the union. *See* GX 2279 & 2280 (Waterfront Commission Audit Reports).

■ We begin by noting that the Taft–Hartley Act prohibits any solicitations by a union officer, whether the money is to be paid directly to the officer, or to another. The Taft–Hartley Act specifically exempts certain payments to union institutions or funds, but only if those payments are received by trust funds established pursuant to a written trust agreement and "jointly administered" by employee and employer representatives. *See* 29 U.S.C. § 186(c)(5).

■ Even assuming, without deciding, that these contributions violated § 186(a) of Taft–Hartley, we hold that there has been insufficient evidence that the defendant

Donald Carson requested, demanded, or otherwise solicited the contributions. *See* § 186(b)(1). Without such proof, the government fails to prove that Carson violated the Taft–Hartley Act by unlawfully soliciting contributions to non-jointly administered union accounts.

## C. Carson's Alleged Embezzlement of Union Funds & Carson's Entitlement to Pension Benefits

In this section we address three issues: (1) whether defendant Carson illegally received payments from Local 1588, including a salary and reimbursement of expenses, in violation of 29 U.S.C. § 501(c); (2) whether Carson is entitled to receive pension benefits from Local 1588; and (3) whether Carson's receipt of pension benefits, should the Court find that he was not entitled to them, constitutes an embezzlement within the proscription of § 501(c).[45] After reviewing the evidence in the record, this Court reaches the following conclusions: (1) Carson embezzled his salary and various reimbursements of expenses from Local 1588 in violation of § 501(c); (2) Carson should be estopped from claiming further entitlement to pension benefits; and (3) Carson's receipt of "pension benefits" from Local 1588 does not constitute an embezzlement. This portion of the Court's Opinion considers the issues raised in *Carson v. Local 1588,* 769 F.Supp. 141.

### 1. The Government's Allegation that Carson Embezzled Union Funds: His Salary & Reimbursed Expenses

*Findings of Fact*

#### a. *Carson's Salary*

Union officers have a statutory duty to expend a union's money and property "in accordance with [the union's] constitution and bylaws." 29 U.S.C. § 501(a). ILA International's constitution provides that the salaries of Local officers are to be "fixed by the membership." GX 2221 at 30.

In 1982, Donald Carson was elected General Organizer of the ILA International. In spite of his new responsibilities with the International, Carson retained his position as Secretary–Treasurer of Local 1588. After Carson assumed his position at the International, he devoted less time to Local 1588 affairs; indeed, approximately 80 percent of his time was spent in New York City at the International's office. Perhaps in recognition of this, Carson's salary was reduced by a few thousand dollars. Nevertheless, for the years between 1983–1987, Carson's reduced salary still exceeded $50,000 annually. GX 4176–80 (Local 1588 LM–2 Reports).

After becoming an officer of the International, Carson made William Fullam a full-time officer. Carson gradually raised Fullam's salary to match his own. *See id.* As a consequence, and even taking into account Carson's slightly reduced salary, a greater portion of Local 1588's assets were devoted to officers' salaries after Carson became an International officer. For example, the total salaries paid to officers by Local 1588 was raised from $99,421 in 1981, to $122,537 in 1982, and to $131,628 in 1983. *See* GX 4174–76 (Local 1588 LM–2 Reports 1981–83).

An examination of the minutes of the General Meetings of Local 1588 from June 5, 1982, to December 5, 1983, demonstrates that the decisions to increase the total salaries paid, and to retain a full-time salary for Carson after he became a part-time employee, were made without the membership's approval.

#### b. *Reimbursed Expenses*

The International's constitution provides that "[a]ll payments and expenditures of each Local Union shall be made by check upon authorization by resolution of the Local Executive Board." Between 1978 and 1988—the years in which Carson was an officer of Local 1588—Carson received over $75,000 as "reimbursed expenses" from the

---

45. The government also contends that defendant Lachnicht violated § 501(c) because he recklessly disregarded his duty to prevent Carson from receiving pension payments. *See*

Gov't's PFF & CL ¶¶ 153–55. Because we conclude that Carson's receipt of pension benefits does not constitute an embezzlement, the government's claim against Lachnicht also fails.

Local's treasury. GX 4171–81 (Local 1588 LM–2 Reports 1978–88). However, these expenses were not, as required by the International's constitution, paid "by check upon authorization by resolution of the Local Executive Board." Instead, Carson was entrusted with the sole power to approve bills submitted to the Local. Tr. at 5652 (Stack).

As a result of the salaries and expenses, Local 1588 had a negative cash flow at the time that Carson retired from service. Tr, 5845–46 (G'Sell).

*Conclusions of Law*

> Section 501(c) of Title 29 provides in part: Any person who embezzles, steals, or unlawfully and willfully abstracts or converts to his own use, or the use of another, any of the moneys, funds, securities, property, or other asset of a labor organization of which he is an officer or by which he is employed directly or indirectly, shall be fined ... or imprisoned ... or both.

Section 501(c) makes it unlawful for a union officer to take union property "knowing that the [union] would not have wanted that to be done." *United States v. Silverman*, 430 F.2d 106, 127 (2d Cir.1970), *cert. denied*, 402 U.S. 953, 91 S.Ct. 1619, 29 L.Ed.2d 123 (1971). The Fourth Circuit recently noted:

> In the context of 501(c), the owner of the property is the union itself.... An appropriation or expenditure of union funds is therefore unauthorized if it is done without the permission of *the union*, even if it is approved by a superior union official. The permission of the union is lacking if the appropriation or expenditure is outside the scope of the fiduciary trust placed in the defendant by the union as a whole and outside the scope of the powers of any superior union official on whose permission the defendant has sought to reply.

*United States v. Stockton*, 788 F.2d 210, 217 (4th Cir.1986), *cert. denied*, 479 U.S. 840, 107 S.Ct. 147, 93 L.Ed.2d 89 (1986) (emphasis in original).

■ Fraudulent intent is the cornerstone of a § 501(c) violation. *United States v. Floyd*, 882 F.2d 235, 240 (7th Cir.1989). To determine whether Carson acted with the requisite fraudulent intent, we must consider the totality of the circumstances. However, the Second Circuit has recently noted that *"Authorization from and benefit to* the union are the controlling lodestars to determine whether a defendant acted with the fraudulent intent to deprive the union of its money." *United States v. Butler*, 954 F.2d 114, 118 (2d Cir.1992) (emphasis added). The *Butler* court went on to note that a union official charged with embezzling union funds lacks the requisite criminal intent when the evidence establishes that he had a "good-faith belief both that the funds were expended for the union's benefit and that the expenditures were authorized (or would be ratified) by the union." *Butler*, 954 F.2d at 118; *see also United States v. Ottley*, 509 F.2d 667, 671 (2d Cir.1975); *Silverman*, 430 F.2d at 127.

■ We believe that the evidence presented by the government demonstrates that Carson had the requisite fraudulent intent to embezzle his full time salary. As noted above, the evidence demonstrates that authorization from the membership was not obtained for the retention by Carson of a full time salary after he became only a part-time employee. Nor was authorization obtained for the periodic increases in salary to Fullam. *See Butler*, 954 F.2d at 119 (defendant's payment of union funds to his son without authorization constitutes embezzlement under § 501(c)). These facts, coupled with two other circumstances, convince this Court that the government has proved by a preponderance of the evidence that Carson had the requisite intent to embezzle:

First, the evidence supports the conclusion that Carson did precious little in return for the generous salary he drew. While Carson was spending most of his time in New York, ostensibly performing services for the International, the union received no real benefit. *See id.*, 954 F.2d at 119 (proper for jury to infer that defendant had requisite intent where, inter alia, he provided no services to union in return

for salary); *see also United States v. Goad*, 490 F.2d 1158, 1161 (8th Cir.1974) (conviction affirmed where government proved that union officers received raises, and that the executive board minutes did not reflect approval of such raises where union's constitution required salary increases to be approved by executive board), *cert. denied*, 417 U.S. 945, 94 S.Ct. 3068, 41 L.Ed.2d 665 (1974).

Second, an extremely large portion of the union's revenues was committed to salaries of union officers. An examination of Local 1588's LM–2 Reports indicates that during part of the relevant period, Local 1588 did not have sufficient funds to pay the salaries to Carson and Fullam.[46] *See, e.g.,* GX 4174, 4178. As Secretary Treasurer of the Local, Carson clearly was aware of this, and, therefore, could not have acted with a good-faith belief that the high salaries were maintained for the legitimate benefit of the union.

We therefore conclude that the government proved by a preponderance of the evidence that Carson embezzled his full-time salary in violation of § 501(c).

■■■ With regard to the issue of Carson's "expenses," the Court reaches the same conclusion, *i.e.,* that Carson's receipt of reimbursements for these expenses constituted multiple violations of § 501(c). In contravention of the International's constitution, the tens of thousands of dollars paid to Carson as expenses were never considered by the Executive Board. GX 6548–69 (Executive Board Minutes 6/3/82–11/10/87). In addition to the evidence already discussed above, which demonstrates Carson's intent to embezzle, we only add that after Carson's departure, the executive board eliminated many of the "expenses" for future union officers for which Carson sought and obtained reimbursement (*e.g.,* cars and credit cards). The Court believes that this is an indication of the fact that Carson's "expenses" were of a nature that provided little if any benefit to Local 1588.

**46.** Indeed, salaries were cut shortly after Carson left office, and slashed in half after the Execu-

### 2. Carson's ERISA Claim

In 1972, shortly before Donald Carson was employed by Local 1588, the Local adopted a Constitution and By–Laws, including Article IX.E, which provided in relevant part:

> All elected officers and Business Agents who have served twelve (12) uninterrupted years of service to the Local Union shall receive a pension until their demise from the Local Union of forty (40%) per cent of their last year's base pay.... After [death], half of his pension goes to his widow until she remarries or dies.

In 1979, the Local amended its Constitution and By–Laws, but Article IX.E was incorporated into the 1979 version without change.

Carson first served as the business agent and then as the elected Secretary–Treasurer of Local 1588. The parties do not dispute that Carson served in these positions for at least twelve uninterrupted years. Carson resigned his position at Local 1588 in 1988, after he was convicted in the criminal RICO action.

After leaving the Local, Carson applied for a pension under Article IX.E of the By–Laws. Initially, Local 1588 granted the application and Carson began receiving monthly pension payments in the amount of $1,387.67. However, some time later the Local concluded that the payments to Carson were not proper and ceased making the payments. By the time payments were stopped, Carson had received approximately $9,280.00 in pension benefits.

Carson then filed a lawsuit against Local 1588 in the District of New Jersey seeking to compel Local 1588, its officers, executive board, and trustees to resume paying the monthly pension, and to guarantee that upon his death payments would be made at half the rate to his wife, Peggy Carson. The New Jersey action was transferred to the Southern District of New York and ultimately consolidated with this civil RICO case. *See* 90 Civ. 5618 (LBS).

tive Board was replaced. Tr. at 5746 (Sanzo); 5845–46 (G'Sell).

In 1991, Carson moved for summary judgment in the ERISA action. This Court denied Carson's motion, *Carson v. Local 1588*, 769 F.Supp. 141, 146 (S.D.N.Y.1991), and the case proceeded to trial in January of 1992. During the trial, Local 1588 litigated the issue of Carson's entitlement to his pension benefits. However, Local 1588 reached a settlement with the government in the civil RICO case early in 1992, and therefore has filed no post-trial findings. Both Carson and the government submitted post-trial proposed findings of fact and conclusions of law that addressed the pension issues.[47]

In the summary judgment motion, the preliminary issue for the Court was whether the Local had established a pension plan as defined under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001 *et seq.* (1988). As recounted in our summary judgment opinion, there was extensive debate over whether the pension provisions in the By–Laws had been ratified by the union membership. Prior to the summary judgment motion, the Court had granted Local 1588 two weeks to locate (1) minutes of the meetings of Local 1588 and its executive board which covered the adoption of Article IX.E and (2) any additional related correspondence which had been seized by the government in connection with the civil RICO case and which the Local contended would prove that the provisions were not self-executing. In a letter to the Court dated April 22, 1991, the Local stated that it was unable to locate the documents and withdrew its argument that Article IX.E was not ratified by the union

membership. This Court then found that the Local had conceded that a pension plan was established, as defined under ERISA.[48]

The government attempts to revisit this finding in its post-trial brief, arguing both that the Local never ratified the By–Laws so that a grant of a pension to Carson was never authorized, and that Carson did not establish the pension plan within the meaning of ERISA. *See* Govt's Amended PFF & CL ¶¶ 134–157. This Court believes that there is no reason to revisit this issue. Neither the Local nor the government produced the relevant documents during the period granted by the Court. Moreover, no further evidence regarding the whereabouts of these documents was submitted by any party at the trial or at any subsequent time. Therefore, we adhere to our finding that the By–Laws were ratified—or more precisely, that the government has failed to meet its burden of proving that they were not ratified—and that a pension plan was established by Local 1588, as defined by ERISA.

In our summary judgment opinion, we found that "top-hat" pension plans,[49] such as that established by Article IX.E, are exempt from the non-forfeiture and non-alienation rules which typically apply to employee pension plans under ERISA. *See Carson*, 769 F.Supp. at 144. We also held that the union could obtain forfeiture of Carson's benefits if it could demonstrate that Carson had breached a fiduciary duty to the pension plan. *Id.* at 145 n. 6; *see also Crawford v. La Boucherie Bernard, Ltd*, 815 F.2d 117, 119 (D.C.Cir.1987)

---

**47.** Though Local 1588 has never stated so in writing, it appears that, at least on key points, the Local and the government are in agreement. *See, e.g.,* Govt's Reply Memo at 43 ("The Local has informed the Government that it is withdrawing its prior statement that the Government is responsible for the loss of the documents.").

**48.** The parties have also debated who is responsible for the inability to locate the Local 1588 minutes. Carson contends that the minutes were seized by the government during a search and never returned. *See* Letter of Fredric J. Gross, Attorney for Donald Carson, to Court, May 17, 1992, at 4–6 (government responsible for loss of the minutes). The government con-

tends that the minutes never existed, or, alternatively, that they were destroyed by reputed mobster John DiGilio. *See* Government's Post–Trial Memorandum at 188 n. 112.

**49.** There has never been any dispute among the parties that this was a "top-hat" pension plan. A "top-hat" pension plan is defined under ERISA as:

> [A] plan which is unfunded and is maintained by an employer primarily for the purpose of providing deferred compensation for a select group of management or highly compensated employees.

29 U.S.C. § 1081(a)(3). *See also Carson*, 769 F.Supp. at 144.

(courts have "broad authority" under ERISA to fashion remedies redressing breach of fiduciary duty). Thus, we noted two circumstances in which Carson would be estopped from claiming pension benefits:

First, [if] . . . Carson failed to comply with the mandated disclosure and reporting provisions of ERISA as required of those responsible for managing top-hat pensions. Second, [if] . . . Carson caused injury to Local 1588's pension fund based on the conduct for which he was criminally convicted in 1988.

*Carson*, 769 F.Supp. at 145. We conclude that the evidence demonstrates that Carson breached his fiduciary duty to the pension plan in the second enumerated manner, *i.e.*, based on his conduct in the MOTBY scheme, which is discussed in great detail in Part IV–A, *supra.*

 We begin by noting that Carson was the pension plan "administrator" as that term is defined in the statute. Where the pension plan fails to designate an "administrator"—as is the case here—the "plan sponsor" is deemed to be the "administrator." 29 U.S.C. § 1002(16)(A)(ii). The term "plan sponsor" is defined, in most cases, as the "employer." 29 U.S.C. § 1002(16)(B). The "employer" is defined as "any person acting directly as an employer, or indirectly in the interest of an employer, in relation to an employee benefit plan." 29 U.S.C. § 1002(5). As Local 1588's Secretary–Treasurer, and, until 1982, its only full-time officer, Carson was the officer responsible for financial matters, including retirement benefit plans. Carson Dep. at 153–154; Lachnicht Dep. at 76–77. Consequently, Carson clearly fits within the definitions of "employer," "plan sponsor," and ultimately "administrator."

As plan administrator, Carson owed a fiduciary duty to the pension fund. ERISA's definition of fiduciary is broad:

Except as otherwise provided in subparagraph (B), a person is a fiduciary with respect to a plan to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct, or indirect, with respect to any moneys or other property of such plan or has any authority or responsibility to do so, or (iii) he has discretionary authority or discretionary responsibility in the administration of such a plan.

29 U.S.C. § 1002(21)(A). The plan "administrator" is, by the very nature of the position, a fiduciary within the meaning of this section. *See* 29 C.F.R. § 2509.75–8 at D–3 (plan administrator is a fiduciary); *see also Freund v. Marshall & Ilsley Bank*, 485 F.Supp. 629, 634–35 (W.D.Wisconsin 1979) (same).

We believe that the evidence demonstrates that Carson's involvement in the MOTBY scheme caused financial injury to Local 1588. When Carson allowed UTI to hire warehousemen—members of Local 1587—instead of upholding ILA policy of insisting that the work be done by deep-sea longshoremen—members of Local 1588—members of Local 1588 lost an employment opportunity, and thus the corresponding salary. Since Local 1588 receives as dues two percent of its member's salary, the Local 1588's treasury lost revenues on account of Carson's decision to allow UTI to hire warehousemen. As we noted in the summary judgment Opinion:

Since the top-hat pension plan is not a funded entity separate from the union treasury, the fund of the union and the fund of the pension plan are one and the same. *Any breach of fiduciary duty committed by Carson that causes a significant loss to Local 1588 is by definition a breach to the pension fund.*

*Carson*, 769 F.Supp. at 146 (emphasis added). Thus, since Carson's actions in connection with the MOTBY scheme harmed the union, and by extension the pension fund, they constituted a breach of his fiduciary duty to the pension fund. Under § 409(a) of ERISA a person who breaches his fiduciary duty to a pension plan "shall be subject to such . . . equitable or remedial relief as the court may deem appropriate."

29 U.S.C. § 1109(a). Therefore, we hold that Carson is estopped from receiving the pension benefits he seeks.

 Whether Carson's receipt of pension funds constitutes an embezzlement under § 501(c) is a much closer question. The issue for this Court to determine is whether the receipt of pension benefits by the administrator of a top-hat pension fund constitutes embezzlement under § 501(c), where that administrator had, prior to his receipt of the benefits, breached his fiduciary duty to the fund. Although we were unable to locate any authorities directly on point, this Court is confident that the correct answer is in the negative.

The Fourth Circuit recently reviewed the elements of embezzlement in the context of § 501(c):

> (1) a conversion … of property belonging to another, where (2) the property is lawfully in the defendant's possession … at the time of the appropriation, and (3) the defendant acts with knowledge that his appropriation of property is unauthorized, or at least without a good-faith belief that it has been authorized.

*Stockton,* 788 F.2d at 217. We do not believe that Carson's receipt of pension benefits fits into this definition of "embezzlement." The benefits that Carson received were not "converted" at a time when they were lawfully in the his possession. A "conversion" is an "unauthorized

appropriation." *Id.* In this case, the Local voluntarily authorized the payment of pension benefits to Carson, believing, perhaps in reliance on Thomas Gleason's legal opinion, that Carson was entitled to them.[50] *See* Carson Exhibit 4 (Gleason's Opinion). There is no evidence that the union made payments to Carson under the belief that he was not entitled to them. While Carson may have sinned against the union in a number of ways, embezzlement of pension funds was not one of them.[51]

### D. The Alleged Extortion of the Democratic and Economic Rights of Members of Local 1588

As further predicate acts to its RICO allegations, the government contends that defendants Carson, Gallagher, and Mangano extorted the economic and democratic rights of Local 1588 members by creating and maintaining a climate of fear and intimidation within the Local. The government also contends that defendant Lachnicht aided and abetted these extortions.[52] By "economic rights" the government means Waterfront jobs, benefits, and union dues. The government defines "democratic rights," as the union members' statutory right to democratic participation in the affairs of the union as guaranteed by the Labor–Management Reporting and Disclosure Act ("LMRDA"), 29 U.S.C. §§ 411 *et seq.*[53]

**50.** Earlier in this Opinion we held that Carson's receipt of a salary for full-time employment, and his acceptance of expense reimbursements, constituted an embezzlement under § 501(c). *See* Part IV.C.1. Our holding there was based on the fact that the union had not authorized the expenditures, and that Carson had not demonstrated that he had a good faith belief that the expenditures were for the benefit of the union. In contrast, we do not believe that Carson's receipt of pension benefits constituted an embezzlement because the union specifically authorized the payment of pension benefits to Carson.

**51.** It follows from our conclusion that the government's contention that Lachnicht disregarded his duty to prevent Carson from receiving pension payments must also fail.

**52.** The government designates these as predicate acts for § 1962(c). *Cf. Local 560,* 780 F.2d at 274 n. 6 (extortion of LMRDA rights properly

characterized as predicate act under § 1962(b) where extortion was for the purpose of "acquiring an interest in and control of" the criminal enterprise.); *District Council,* 778 F.Supp. at 744–45.

**53.** The LMRDA essentially incorporates the premise of union democracy into the law by requiring unions to live up to certain minimum democratic standards, as set forth in the statute. For example, the LMRDA guarantees freedom of speech and assembly. 29 U.S.C. § 411(a)(2). The LMRDA also protects union members' right to sue, *id.,* § 411(a)(4), and contains a provision guaranteeing due process in disciplinary proceedings. *Id.,* § 411(a)(5). The LMRDA contains broad provisions regulating union elections, union election campaigns, and nominations. *Id.,* §§ 481–83. Finally, the LMRDA imposes on union officers fiduciary obligations to the members and the funds of the union. *Id.,* § 501.

In the Amended complaint, the government alleged that defendants Mangano, Carson, and Gallagher (among others), aided and abetted by Lachnicht (among others):

> [D]id unlawfully, willfully, and knowingly obstruct, delay and affect commerce and the movement of articles and commodities in commerce by acts of extortion, as these terms are defined in [the Hobbs Act], in that they obtained and attempted to obtain money and property from the membership of Local 1588, including the rights of union members to free speech and democratic participation in internal union affairs as guaranteed by [LMRDA] ..., which rights the defendants obtained and attempted to obtain from the members of ILA Local 1588, with their consent induced by the wrongful use of actual and threatened force, violence, and/or fear, including fear of physical and economic injury; that is, that among other means, the defendants did create and attempt and conspire to create a climate of intimidation and fear which demonstrated that ILA Local 1588 was under the control of, and acting on behalf of, La Cosa Nostra figures.

Amended Complaint ¶ 80. Essentially, it is the government's position that all of the acts in the complaint taken together created an atmosphere wherein union members were led to feel intimidated, threatened, or pressured in the exercise of their rights to union democracy.

■ As noted above, to make out a violation of the Hobbs Act, the government must prove that the defendants (1) obtained "property" from another; (2) by wrongful use of actual or threatened force, violence, or fear; (3) with the intent to do so; (4) where such actions had an effect on interstate commerce.[54] 18 U.S.C. § 1951(a) & (b)(2). Extortion of so-called "economic rights" from union members clearly constitutes a Hobbs Act violation. In addition, several courts have recognized that the rights of union members to democratic participation, as provided by the LMRDA, are "property" rights which can form the basis

of a Hobbs Act violation. *See Local 560* 780 F.2d at 281–82; *District Council,* 778 F.Supp. at 755–57; *United States v. International Brotherhood of Teamsters,* 708 F.Supp. 1388, 1397–99 (S.D.N.Y.1989). This conclusion is the logical consequence of the fact that the Hobbs Act "speaks in broad language, manifesting a purpose to use all the constitutional power Congress has to punish interference with interstate commerce by extortion, robbery, or physical violence." *Stirone v. United States,* 361 U.S. 212, 215, 80 S.Ct. 270, 272, 4 L.Ed.2d 252 (1960). We agree with the results reached by these courts and hold that a deprivation of democratic rights can give rise to a Hobbs Act violation.

The question for this Court to resolve is whether the evidence in this case demonstrates that the defendants intentionally created, maintained, and/or exploited a climate of intimidation within the Local which resulted in the extortion of the members' economic and democratic rights. This requires the Court to determine whether the government proved sufficient discrete acts on the part of each defendant. In making this assessment, we bear in mind the Third Circuit's observation that "fear can be invoked in subtle and indirect ways." *Local 560,* 780 F.2d at 288 n. 4. We conclude that the evidence demonstrates that Carson committed multiple extortions of Local 1588 members' democratic rights and that Lachnicht, who had a fiduciary duty to prevent the extortion, aided and abetted these Hobbs Act violations. We do not believe, however, that the evidence demonstrates that Mangano and Gallagher extorted the union members' democratic rights. We also conclude that the government failed to demonstrate that any of the defendants extorted the economic rights of Local 1588 members.

### 1. Extortion of LMRDA Rights

#### a. *Carson, Gallagher, and Mangano*

■ The government contends that two circumstances demonstrate the existence of a climate of fear among the membership of

---

**54.** Once again, there is no dispute that the jurisdictional element has been proved.

Local 1588: (1) the "notorious corruption and mafia reputation" of those associated with the leadership of the ILA and Local 1588, principally Genovese soldier John Di-Gilio, Govt's Amended PFF & CL ¶ 162; ¶¶ 167–177; and (2) the failure of the union membership to criticize the policies and practices of the union or to conduct any opposed elections during "the entire Carson–DiGilio era," even in the face of circumstances that, in the government's opinion, would invite criticism or opposition. *Id.*, ¶¶ 184, 188. We will consider each circumstance in turn.

Turning first to the question of the "mafia" reputation of union leaders, the government must prove not only that the local was perceived as being corrupt by the rank and file membership, but also that this perception intimidated union members and induced them to surrender their democratic rights. At the outset, we note that the evidence demonstrated that John DiGilio was a member of the Genovese Family and that he controlled a "crew" which included many Waterfront figures. Indeed, this was not seriously disputed by any of the parties.

The government contends that John Di-Gilio "though not legitimately associated with the union" was nevertheless closely tied to it in the minds of the union membership. *Id.*, ¶ 169. As evidence of this association, the government relies on the following facts and circumstances: (1) DiGilio maintained a constant presence at Local 1588's office in Bayonne;[55] (2) the building that housed the union office had been purchased from DiGilio's mother;[56] (3) Galla-

gher rented an apartment which he used as an office above Local 1588's office and was visited there several times by John DiGilio;[57] (4) DiGilio and Local 1588 shared the same lawyer;[58] (5) DiGilio "picked" Carson and William Fullam to fill Local 1588's two most significant Executive Board positions;[59] (6) Carson and DiGilio were life-long friends;[60] and finally (7) the UNIRAC undercover operation known as Project Alpha, illustrated that Carson and Fullam were controlled by DiGilio and the Genovese family.[61] We believe that this evidence demonstrates that John DiGilio had some influence over Local 1588, principally through his close association with defendant Carson.

However, it is not enough for the government to demonstrate that the Genovese family had infiltrated the union: the government must also demonstrate that the union membership was aware of DiGilio's association with Local 1588 and regarded such association as threatening. The government offers the following as evidence that the union membership was aware of the union's LCN ties: (1) DiGilio's influence over Local 1588 was disclosed in the Senate's 1981 Hearings on Waterfront Corruption;[62] (2) Carson's recurring entanglements with law enforcement were acknowledged (even celebrated) by Carson at several General Meetings of the union;[63] (3) articles frequently appeared in the local press reporting on the union's corruption; (4) several union members testified at depositions that they were aware of the articles and/or of the Local's ties to organized

---

55. Sanzo Dep. at 211–212 (DiGilio was "in and out" of Local 1588's office); Terraciano Dep at 63–65 (DiGilio would visit Local 1588's office "time and time again"). *See also* Lachnicht Dep at 106–109.

56. Sanzo Dep. at 230–31.

57. Gallagher Dep at 59–60, 98–99.

58. Sanzo Dep. at 228 (Larry Bronson was lawyer to DiGilio and Local 1588).

59. *See, e.g.,* GX 140AA Dig at 13 ("I stayed up all fuckin' night fighting with 20 fucking guys to get [Fullam] where he is, but no big deal....") (DiGilio speaking to Carson).

60. GX 6532 (General Meeting minutes 6/23/82) (describing DiGilio as Carson's "life long friend").

61. GX 2257 at 349–84 (1981 Senate Hearings).

62. *See generally* GX 2257 at 349–84 (1981 Senate Hearings).

63. *See, e.g.,* GX 6516 (General Meeting minutes 11/10/87) (Carson explained "to the members about the impending indictment against him, and urged the members not to believe everything they read in the papers").

crime;[64] and finally (5) many of these union members also testified that rumors regarding Carson and DiGilio's association with organized crime were prevalent on the waterfront. We believe the government has *proved by a preponderance of the evidence that a substantial portion of the membership was aware of DiGilio's (and through him the Genovese Family's) association with Local 1588.*

The government also presented *persuasive evidence that the union members were* intimidated by the Local's association with organized crime. First and foremost, an examination of the minutes from General meetings of Local 1588 indicates that there were no opposed elections during Carson's tenure at the union. *See, e.g.,* GX 6524 (General Meeting minutes 12/13/84); GX 6516 (General Meeting minutes 11/10/87). The government also demonstrated that the union did not criticize or object to Carson's leadership on occasions during which an objective observer might have expected to hear such criticism or objections. For example, during several union meetings, Carson's recurring entanglements with law enforcement were discussed. Rather than being an occasion where the suitability of Carson for high union office was debated, Carson received standing ovations for withstanding the "relentless harassment by the government." GX 6532 (General Meeting minutes 6/23/82); *see also* GX 6519 (General Meeting minutes 11/10/86) ("Relentless in their efforts to embarrass the I.L.A., Mr. Carson stated that the Justice Department would stop at nothing in trying to convict himself and his life long friend John DiGilio"); GX 6535 (General Meeting minutes 3/1/83).

We think that it is fair to infer from these two circumstances that the union membership was intimidated by DiGilio and the Genovese family's association with Local 1588. As the government's labor expert, Professor Clyde Summers, framed the issue:

One hypothesis explaining such a situation would be that all segments of the membership are fully content with the leadership, a scenario which seems to me to be highly unlikely. The other hypothesis is that the membership has been intimidated and feels constrained not to raise its voice in protest against the incumbent regime.

GX 4001, ¶ 42 (Summers). We agree with Professor Summers that the more likely scenario is that the union members' silence was the result of fear and intimidation. We also note two circumstances that suggest that the veil of fear apparently was lifted after the execution of DiGilio and Carson's conviction and retirement from the union. First, membership attendance has increased at Local 1588 meetings. Lavin Dep. at 66. Second, since Carson's retirement from the union, the membership regularly complains of his abuses as an officer. Tr. 5854 (G'Sell). Therefore, we conclude that the record indicates that the membership's LMRDA rights were forfeited as a result of fear.

To summarize, thus far we have determined that a climate of fear existed within Local 1588 which resulted in the forfeiture by the union members of their LMRDA rights. However, an important and fundamental question remains: which (if any) of the defendants committed Hobbs Act violations? In other words, which defendants intentionally put the statutorily identified means—actual or threatened force, violence, or fear—to wrongful use and thereby extorted Local 1588 members' LMRDA rights? While we have no doubt that the union members failed to exercise their democratic right out of fear of Genovese family interference, we are less certain that the remaining defendants were in whole, or in part, responsible for the climate of fear and thus liable for multiple Hobbs Act extortions of the union members' democratic rights. The government claims that Carson, Gallagher, and Mangano were each responsible for the extortions. We believe that the evidence demonstrates that only

---

**64.** *See, e.g.,* Sanzo Dep at 293; Terraciano Dep at 59; Pellicia Dep. at 100–03; Angelone Dep. at 95.

Carson committed discrete acts that warrant a finding that he extorted the LMRDA rights from the membership of Local 1588.[65]

█ The gravamen of a Hobbs Act extortion of democratic rights is that specific behavior by the defendant creates or maintains an atmosphere wherein union members are lead to feel intimidated, threatened, or pressured in the exercise of their democratic rights. An examination of case law indicates that different types of acts can support a finding of a Hobbs Act extortion of LMRDA rights. *See Local 560*, 780 F.2d at 273–75, 278–280; *District Council*, 778 F.Supp. at 754–57; *International Brotherhood of Teamsters*, 708 F.Supp. at 1399. First, and most obviously, where the defendant makes actual threats or commits acts of violence against union members, a Hobbs Act violation is most readily made out. Second, an extortion of democratic rights might be found where the defendant openly and notoriously commits racketeering acts connected with the union, or with the market in which the union is providing a labor force. Third, the appointment to union positions of known or reputed members of organized crime by the defendants could give rise to a Hobbs Act extortion, for union infiltration by organized crime obviously has a chilling effect on the exercise of democratic rights. Finally, an extortion of democratic rights can be proven where the defendant's open and notorious association with organized crime figures casts a specter of fear over the union. This is not intended to be an exclusive or exhaustive list of the kinds of situations in which a Hobbs Act extortion of democratic rights can be proven.

We believe that the government demonstrated that Carson created and maintained a climate of fear in the union and exploited that fear to maintain control of Local 1588. The evidence, discussed above, demonstrates that Carson's nefarious association with John DiGilio and the Genovese family was well known to the union membership. The evidence also proved that Carson was

indicted, and later convicted, of labor racketeering. We believe it is a fair inference that the union membership's silence during Carson's reign was the result of the union's fear of Carson's association with DiGilio and the Genovese crime family.

█ By contrast, the government presents very little evidence that either Mangano or Gallagher created, maintained, or exploited the climate of fear within the Local. Mangano's only connection with this extortion was his alleged "sanctioning" of DiGilio's control over the Waterfront. Govt's Amended PFF & CL ¶ 168. Although Gallagher is alleged to have associated with Carson and John DiGilio, there is very little to connect him with Local 1588. The fact that Gallagher rented an office above the Local's office is not sufficient to support a finding that he extorted the union member's democratic rights. There is no evidence that Mangano and Gallagher threatened the union members. Nor did the government provide any evidence that the 1588 membership was intimidated by either Mangano or Gallagher into silence. The fact that the union members feared the Genovese crime family, and the fact that Mangano and Gallagher were, to varying degrees, connected to the Genovese family, is not, in and of itself, sufficient to support a finding that they committed multiple extortions of Local 1588 members' LMRDA rights.

### b. *George Lachnicht*

We turn now to the government's allegation that Lachnicht aided and abetted multiple Hobbs Act violations of Local 1588 members' LMRDA rights.

At his deposition, Lachnicht testified that he learned in the early 1980's that DiGilio and Carson were being investigated by federal prosecutors. Lachnicht Dep. at 308–09. He also testified that he was present at a membership meeting where Carson was reelected without opposition while the investigation was pending. *Id.* at 304, 333. In addition, Lachnicht was present at a

---

**65.** Of course, we reach no conclusions as to whether other persons not encompassed by these findings committed Hobbs Act extortions of Local 1588 members' democratic rights.

membership meeting where Carson was re-elected without opposition even though he was under indictment. *Id.* at 316–17, 336–37.

■ Under § 501(a) of LMRDA, a union officer has an affirmative duty to investigate allegations of corruption by other union officers and to take such reasonable steps as necessary to redress such corruption. Section 501(a) provides:

> The officers ... of a labor organization occupy positions of trust in relation to such organization and its members as a group. It is, therefore, the duty of each such person ... to hold its money and property solely for the benefit of the organization and ... to refrain from dealing with such organization as an adverse party or on behalf of an adverse party in any matter connected with his duties and from holding or acquiring any pecuniary or personal interest which conflicts with the interest of such organization ...

29 U.S.C. § 501(a).

The Third Circuit in *Local 560* held that the Executive Board of Teamsters Local 560 aided and abetted acts of extortion by failing to act in accordance with their fiduciary responsibilities:

> The district court addressed the ethical duty that union officers owe the membership for the purpose of examining the extortion of LMRDA rights in the correct light ... Thus, the district court simply recognized that, if an individual fails to act when he has an affirmative duty to do so, negative inferences concerning his intent can be drawn from his inaction. Moreover, it has long been settled that it is permissible to infer from circumstantial evidence the existence of intent

780 F.2d at 284 (citations omitted). This fiduciary duty applies to each union officer.

Judge Haight reached the same conclusion in the government's civil RICO action involving the Carpenters' District Council in New York City. *See District Council,* 778 F.Supp. at 749. Addressing this issue, Judge Haight noted that federal law imposes a duty to investigate corruption.

■ As an officer of Local 1588, Lachnicht had the duty to protect the membership's rights. We believe that the evidence demonstrates that he systematically failed to do this. For example, Lachnicht's only response to Carson's conviction was that it was a "shame what happened to Donald." *Id.* at 317–18. Instead of removing Carson from his union position after his conviction, Lachnicht intended to wait to see how Carson's appeal turned out. *Id.* at 322–24. Indeed, Lachnicht testified, somewhat incredibly, that he did not form an opinion regarding Carson's guilt or innocence: "I didn't even give it a thought." *Id.* at 305–309.

Because Lachnicht was aware that the Genovese Family was interfering in the governance of Local 1588, and because Lachnicht, nevertheless, willfully failed to carry out his duties as an officer of Local 1588 to investigate and put a stop to the interference, this Court finds that he aided and abetted Carson's extortions of the democratic rights of Local 1588's membership.

2. Extortion of Economic Rights

■ Finally, we turn to the question of the extortion of economic rights from union members. We conclude that the government has failed to make out Hobbs Act violations with regard to any of the defendants.

The government's theory appears to be that the extortion of the union members' democratic rights enabled the defendants to deprive the union members of dues, benefits, and jobs. However, we do not believe that the government has demonstrated the causal relationship between the extortion of democratic rights and economic rights with sufficient specificity. For example, the government does not specify which actions by the defendants, or which union policies implemented by the defendants without the approval of the union membership, caused economic harm to the membership. Nor does it specify that the union members were aware of these policies (or actions) or that they would have (or could have) objected to them. Finally, the government does not demonstrate that it

was because of the wrongful use of actual or threatened force, violence or fear that the union members were deprived of economic rights.

This can perhaps be made clearer by reference to a specific example. The one extortion of economic rights that is spelled out with slightly more clarity in the government's papers involves the MOTBY scheme. The government claims that the rights of the deep-sea members of Local 1588 to employment by UTI was extorted from them when Carson, Mangano and Gallagher allowed the use by UTI of cheaper warehouse labor instead of deep-sea labor as was standard ILA policy. However, the government never demonstrated that the statutory means—*i.e.*, the wrongful use of actual or threatened force, violence or fear—was employed to deprive the union members of the employment opportunity with UTI. The government never demonstrated that the union membership was aware of this arrangement, or that threats or use of force, violence, or fear prevented them from objecting to the practice. *See generally* Part IV.A, *supra.* Therefore, we find that there was no extortion of the union members' economic rights.

E. Lachnicht's "No–Show" Job

We turn next to the government's claim that defendant Lachnicht's "no-show" job constituted a Hobbs Act extortion and a violation of the Taft–Hartley Act.

*Findings of Fact*

For approximately three decades, defendant George Lachnicht was a longshoreman and vice president of Local 1588. In 1958, Lachnicht joined Local 1247, a predecessor of Local 1588 based in Jersey City, New Jersey. Lachnicht Dep. at 16. In or around 1961 or 1962, Lachnicht became the Vice President of Local 1247. *Id.* at 114. When Local 1247 merged with Local 1588 in 1976, Lachnicht retained his union position as Vice President of the new local. *Id.* at 116–117.

Throughout the period that he worked for Prolerized Shiabo Neu ("PSN") as a hiring agent, Lachnicht was Vice President of the local that supplied PSN with longshoremen. Lachnicht Dep. 116.20–118.4.

From January 1972 until he retired in 1990, Lachnicht was employed as a hiring agent by PSN at Claremont Terminal, New Jersey. During all times relevant to this lawsuit, PSN operated a scrap metal recycling and processing business in which the metal components of used products, such as automobiles, were broken down, stockpiled, and then exported overseas by ship. Tr. 4269, 4271 (Zimmern). Almost the entire operation was handled by fifty or sixty full-time employees, all members of Local 734 of the Laborers International Union. Tr. 4269–70 (Zimmern): Tr. 5383 (Trant). On those days when a ship was docked at Claremont Terminal, PSN also hired a team of longshoremen—all members of Local 1588—to provide assistance in connection with the loading of the ship. Tr. 4270 (Zimmern). Since 1976, PSN unloaded approximately twenty ships a year at Claremont Terminal. Tr. 4271 (Zimmern); Tr. 5396 (Trant).

The evidence presented at trial showed that on days when no ship was in port, Lachnicht performed no services for PSN. Tr. 5196 (Zimmern); Tr. 5391–92 (Trant). Even on those days when a ship was in port, Lachnicht's duties can accurately be described as "minimal." Lachnicht's primary duty, as hiring agent, was to select the ten other longshoremen who would work for PSN and then inform them when the ship would arrive at the port. Tr. 4289, 5150 (Zimmern); Lachnicht Dep. at 98.5–98.16. However, because the gang of longshoremen was generally made up of the same individuals, Lachnicht was not called upon to hire new longshoremen very frequently. Tr. 5441 (Trant). When Lachnicht did hire longshoremen for PSN, he hired members of the Genovese Family.[66] *See* Lachnicht Dep. at 23, 29, 30–31, 68, 75, 95. Lachnicht's only other responsibility was to verify that the crew of longshoremen had reported for work, a task that took approximately ten minutes and that was duplicated by the ILA timekeeper. Tr.

**66.** *See* Part IV.G, *infra.*

4288–89 (Zimmern); Lachnicht's Dep. at 98.[67] This Court concludes that the evidence amply supports the government's assertion that Lachnicht's position with PSN was a "no-show" job.

The evidence at trial also demonstrated that Lachnicht's "no-show" job was rather lucrative. Each week from 1972 until he retired in November 1989, Lachnicht was paid for a full five days of work regardless of whether there was a ship docked at Claremont Terminal, and regardless of whether he performed any work for PSN. Tr. 4273, 4301–02 (Zimmern); Tr. 5391–92 (Trant). In addition to his base salary— approximately $37,000 annually—Lachnicht received two other benefits from PSN. See, e.g., GX 3350 (PSN 1989 Payroll Record). First, Lachnicht received compensation for one hour of overtime each day, five days a week, above and beyond the eight hours of straight pay that he received. Lachnicht received this overtime pay even though he worked no overtime hours. Tr. 4276, 4301 (Zimmern); GX 3351, 3352B, 3353B, 3354B, 3355, 3356A (PSN Payroll Records). Indeed, as noted above, Lachnicht rarely worked at all. Second, Lachnicht received $500 annually at Christmas, which PSN generated out of petty cash. Tr. 4297–98, 5196 (Zimmern). Lachnicht testified that this sum was for reimbursement for the use of his home telephone for work related calls. However, his claim that such "reimbursement" was industry custom is not supported by the evidence. In fact, Jay Zimmern, the General Manager of PSN, expressly denied that PSN and Lachnicht had "ever work[ed] out a method of remuneration for Lachnicht's telephone expense." Tr. 5151 (Zimmern).

Lachnicht claims that his job entailed additional responsibilities other than those already mentioned which justified his salary. For example, he claims that he directed the work of the other longshoremen. However, the evidence demonstrates that the union foreman had that responsibility, not the hiring agent. Tr. 4290 (Zimmern); Tr. 5384–87 (Trant). Lachnicht's counsel attempted, during cross-examination of various witnesses, to demonstrate that Lachnicht was "on call" twenty-four hours a day, and therefore received money for services rendered to PSN. Tr. 5411–12 (Trant). Kevin Trant, a PSN foreman, testified that Lachnicht occasionally gave advice about how to deal with the workmen and "get the job done." Tr. 5408–09 (Trant).[68] Even were the Court to credit as true Lachnicht's contention that he acted as a consultant or that he was "on call," this Court would still be compelled to conclude that the record provides no basis for finding that Lachnicht performed a service that justified the pay and other remuneration that he received, given the occasional and insubstantial nature of the services he allegedly performed.

Jay Zimmern, general manager of PSN, testified that he attempted to alter the lucrative salary arrangement established by Lachnicht and Zimmern's predecessor, Sal Sforza, "many times." Tr. 5197, 5199. On one occasion when Zimmern informed William Fullam, Local 1588's President, of PSN's intent to eliminate Lachnicht's position, Fullam protested that it "would not be a nice thing to do" and insisted that Lachnicht's arrangement be continued until Lachnicht retired. Tr. 5198 (Zimmern).

Zimmern chose not to insist on Lachnicht's termination because he feared that, were he to do so, Lachnicht would order the union to initiate "pickets or some sort of job action." Tr. 5197 (Zimmern).

---

**67.** Indeed, Kevin Trant, PSN's foreman, testified that the only occasion that he could remember seeing Lachnicht near a ship while the longshoremen were working was on the day of his alleged accident. Tr. 5389. See infra (Part IV.H) (discussion of Lachnicht's alleged accident).

**68.** Trant testified on cross examination:
Q. Is it fair to say that he gave you advice from time to time?
A. Yes, sir.
Q. On the workings of the scrap yard and on the workings of the port?
A. Yes, sir.
Q. Also on the management-labor relations, less so, but on how to deal with men and how to get the job done?
A. With his men, yes.
Tr. 5408 (Trant).

Several other factors appear to have contributed to Zimmern's reluctance to disturb Lachnicht's "no-show" job. For example, Zimmern testified that he was aware that, because of the Waterfront Commission's lack of jurisdiction over PSN's bulk cargo operation, many of the longshoremen who worked at Claremont Terminal were Waterfront Commission "strike outs"—i.e., they were ineligible to work on the waterfront—with criminal records. Tr. 4309–10 (Zimmern). Zimmern was also aware that Himoff, a nearby Waterfront business, had "six or eight full-time" ILA employees. Tr. 4280 (Zimmern). Zimmern specifically testified that he had considered the union's ability to force his competitors to hire even more employees whose salaries were not commensurate to the services they provided when deciding not to make an issue of Lachnicht's salary and position. Tr. 4280–81 (Zimmern).

Finally, the evidence presented at trial also indicates that Zimmern was aware of Lachnicht's previous attempted extortion of a waterfront employer. In March of 1970, the Waterfront Commission revoked Lachnicht's registration as a longshoreman when it determined that he had "wilfully committed … an act of intimidation without justification or excuse of law, by threatening a work stoppage against the Nacirema Operating Co., Inc., a licensed stevedore, at a time when there were perishable goods in excess of $100,000 on the pier, in order to … force [Nacirema] to hire him as a tractor foreman." GX 4195 at 2. The Commission also determined that he "committed fraud, deceit and misrepresentation" in connection with an interview conducted by the Commission. *Id.*

In return for not disturbing Lachnicht's salary and benefit arrangement, PSN received concessions from the union to the detriment of Local 1588's rank and file members. These concessions included a reduction in the number of days the longshoremen were needed and, at PSN's request, a reduction by Local 1588 of its

gang size from 19 to 11. Tr. 4272, 5144–45 (Zimmern).

### Conclusions of Law

1. Hobbs Act

 The Hobbs Act prohibits obstruction, delay, or interference with interstate commerce by means of extortion. 18 U.S.C. § 1951(a). "Extortion" is defined by the statute as "the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right." 18 U.S.C. § 1951(b)(2). The government's first contention is that Lachnicht used his position as a union officer to extract a lucrative position from PSN, in violation of this statute, by exploiting PSN's fear of labor unrest. We believe the government has proven its case.

In order to establish a predicate act for violation of the Hobbs Act, under the circumstances of this case, the Government must show that (1) the defendant received the property of another without any lawful claim to such property; (2) the alleged victim made the payment out of "fear"; and (3) the defendant had an intent to exploit the alleged victim's fear.[69] *United States v. Capo*, 791 F.2d 1054, 1061–62 (2d Cir. 1986); *United States v. Kopituk*, 690 F.2d 1289, 1328 (11th Cir.1982). We will consider each of these elements separately.

a. *Property of Another*

The first element need not detain us for long, for the evidence presented at trial overwhelmingly demonstrates that Lachnicht's position at PSN was a "no-show" job for which he was paid a handsome salary. It has long been established that the Hobbs Act reaches instances where a union official uses fear to obtain from his employer a salary for a "no-show" job like the one Lachnicht obtained from PSN. For, in such a case, the employer's property—the wages—has been misappropriated, and the act of obtaining a salary for "imposed, unwanted, superfluous, and fictitious services" is clearly "wrongful" be-

---

**69.** There is also a requirement that the extortion affect or obstruct interstate commerce, but that element is not in contention here.

cause the alleged extortionist has no lawful claim to that property. *See United States v. Enmons,* 410 U.S. 396, 400, 93 S.Ct. 1007, 1009–10, 35 L.Ed.2d 379 (1973). This Court finds, therefore, that the first element of a Hobbs Act violation has been established.

b. *Reasonable Fear*

██ The government need not prove that the fear experienced by the victim was a consequence of a direct threat by the defendant in order to make out a violation under the Hobbs Act. *Capo,* 791 F.2d at 1061; *United States v. Duhon,* 565 F.2d 345, 351 (5th Cir.1978). Rather, the government need only prove that the victim had a reasonable fear that the defendant had an intent to exploit or extort. *Id.* With regard to the reasonable fear requirement, the Second Circuit has noted:

> In a prosecution for extortion by the wrongful use of the fear of economic loss, the government must prove that the victim reasonably believed two things: 'first, that the defendant had the power to harm the victim, and second, that the defendant would exploit that power to the victim's detriment.'

*United States v. Covino,* 837 F.2d 65, 68 (2d Cir.1988) (quoting *United States v. Capo,* 817 F.2d 947, 951 (2d Cir.1987) (en banc)).

Where a union has a long history of corruption, "fear can be invoked in subtle and indirect ways." *Local 560,* 780 F.2d at 288 n. 24. The government offered a great deal of evidence that tended to show that Zimmern was aware of Lachnicht's long association with organized crime figures,[70] the tactics of the dock workers at Claremont Terminal,[71] and Lachnicht's previous attempt to use his union position to extort

concessions from an employer. Evidence was also received that indicated that Zimmern was aware that other Waterfront employers were even less successful than PSN in avoiding unreasonable employment arrangements. Tr. 4280–81. For example, Zimmern testified that Himoff, a nearby Waterfront business, had "six or eight full-time" ILA employees who apparently enjoyed similar sinecures. Finally, Zimmern also testified that, in deciding not to insist on Lachnicht's termination, he considered the union's strength and its ability to force his competitors to hire even more employees whose salaries were not commensurate to the services they provided. *Id.*

This Court believes that this evidence demonstrates that Zimmern's fear that Lachnicht would use his position as Vice President of Local 1588 to incite labor unrest was reasonable. This Court also believes that the evidence supports the conclusion that it was reasonable for Zimmern and PSN to conclude that Lachnicht had the ability to incite such unrest, considering his position as Vice President of the local, and his connection with well-known organized crime figures.

c. *Lachnicht's Intent to Exploit*

Finally, this Court believes that it can reasonably infer from all the circumstances that Lachnicht intended to exploit PSN's fear in order to extort his lucrative "no-show" job. *See Capo,* 817 F.2d at 954.

The government admits that the only conversation that Zimmern could recall in which a union officer insisted that Lachnicht's arrangement be continued until Lachnicht retired involved William Fullam. The government argues, however, that because Lachnicht and Fullam were "very

---

**70.** There is ample authority that holds that knowledge of a defendant's Mafia reputation is admissible to prove fear on the part of an alleged victim to extortion. *See United States v. Russo,* 708 F.2d 209, 214 (6th Cir.), *cert. denied,* 464 U.S. 993, 104 S.Ct. 487, 78 L.Ed.2d 682 (1983); *Carbo v. United States,* 314 F.2d 718, 740 (9th Cir.1963); *United States v. Tropiano,* 418 F.2d 1069, 1081 (2d Cir.1969). For "[t]he reputation of the defendants becomes relevant since such a reputation frequently conveys a tacit

threat of violence." *United States v. Billingsley,* 474 F.2d 63, 66 (6th Cir.), *cert. denied,* 414 U.S. 819, 94 S.Ct. 42, 38 L.Ed.2d 51 (1973).

**71.** As noted above, Zimmern testified that he was aware that, because of the Waterfront Commission's lack of jurisdiction over PSN's bulk cargo operation, many of the longshoremen who worked at Claremont Terminal were Waterfront Commission "strike outs" with criminal records. Tr. 4309–10.

close" childhood friends who had worked together on the waterfront for forty years, it is reasonable to infer that Lachnicht and Fullam acted in concert. As further support, the government notes that Lachnicht's control of PSN's longshore hiring was regularly used by John DiGilio, Donald Carson, and Fullam to procure Waterfront jobs for their Genovese Associates. *See infra.* This Court agrees with the government that this evidence supports the inference that Lachnicht intentionally took advantage of PSN's fear to extort his "no-show" job.

In addition, the government argues that Lachnicht's history of resorting to threats to obtain a promotion supports the inference that Lachnicht had the requisite intent to extort from PSN. Although evidence of so-called "prior bad acts" is not generally admissible as evidence of character, Fed. R.Evid. 404(b) carves out an exception where such evidence is offered to prove "intent." [72] This Court believes that the evidence of Lachnicht's threats to a stevedore of a work stoppage if it failed to hire him as a tractor foreman, *see* GX 4195 at 2 (Waterfront Commission Order), is admissible to prove that Lachnicht had the requisite intent to extort from PSN his "no-show" job.

Therefore, this Court holds that the government has demonstrated that Lachnicht extorted his "no-show" job in violation of the Hobbs Act.

### 2. Taft–Hartley Act

The government's second contention is that Lachnicht violated the Taft–Hartley Act.

As we have set forth above, § 302(a) of the Taft–Hartley Act makes it unlawful for any employer to pay "any money or other thing of value" to an officer of a union "which represents ... any of the employees of such employer." 29 U.S.C. § 186(a)(2). In addition, § 302(b) of the

statute makes it unlawful for any person to "request, demand, receive, or accept" any money or other thing of value prohibited by subsection (a). 29 U.S.C. § 186(b). Union officers are strictly liable for accepting payments in violation of Taft–Hartley. In addition, it is unnecessary "for the government to prove the employers' guilt as a predicate to [the union official's]. It [is] enough to show that the employer paid, lent, or delivered [the thing of value] and that [the union official] accepted [it]." *Cody,* 722 F.2d at 1059.

█ We begin by noting that the government established a prima facie case of a violation of Taft–Hartley. First, the evidence demonstrates that Lachnicht received payments from PSN, namely his salary, the weekly overtime pay for five hours he did not work, and the $500 Christmas Bonus. Second, it is undisputed that PSN employs members of Local 1588. Third, Lachnicht knew he was receiving payments from PSN. Finally, there is no dispute that Lachnicht was an "officer" of Local 1588. *Id.* at 1059–60. Therefore, the only way for Lachnicht to demonstrate that he did not violate Taft Hartley is to demonstrate that the circumstances qualify for one of the statutory exceptions to § 302(a) set forth in § 302(c).

Section 302(c) sets forth five narrow exceptions to § 302(a). Defendant Lachnicht argues that the payments received by him from PSN qualify for the first exception which permits officers of a union who are also "employees" of the employer to receive wages and benefits from the employer without violating the statute. 29 U.S.C. § 186(c)(1). The question for this Court to resolve is whether Lachnicht was an "employee" within the meaning of § 302(c).

█ To qualify for the "employee" exception to Taft–Hartley, Lachnicht must demonstrate that his receipt of "wages"—including overtime pay—on days on which he provided no services to PSN, and his

---

72. Rule 404(b) provides:
 Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible

for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.
Fed.R.Evid. 404(b).

receipt of the $500 at Christmas from PSN, was on account of his employment with PSN, and was not a "sham." *Arroyo*, 359 U.S. at 424, 79 S.Ct. at 867. In other words, he must demonstrate that he is a "bona fide" employee of PSN. However, "a union official put on an employee payroll but assigned no meaningful work for the employer would not amount to a 'bona fide employee,' and payments to him would violate § 302." *N.L.R.B. v. BASF Wyandotte Corp.*, 798 F.2d 849, 856 n. 4 (5th Cir.1986). The Second Circuit has explained:

> [W]e do not suggest that [§ 302(c)(1)] would allow an employer to simply put a union official on its payroll while assigning him no work. Such an official would not be a bona fide "employee" within the meaning of the statute, and this would be precisely the kind of device that §§ 302(a) and (b) were designed to prevent. Nor does the language of § 302(c)(1) appear to sanction such a device. The exception permits compensation for or by reason of "service as an employee"; a union official who, though on the employer's payroll, performs no service as an employee, would not be within § 302(c)(1)'s exception.

*BASF Wyandotte Corp. v. Local 227, International Chemical Workers Union*, 791 F.2d 1046, 1050 (2d Cir.1986). As discussed at length above, the evidence overwhelmingly demonstrates that Lachnicht's position with PSN was a "no-show" job. As such, Lachnicht was not a "bona fide" employee and does not qualify for the § 302(c)(1) "employee" exception.

Even if this Court had been persuaded that Lachnicht was a bona fide employee of PSN, we would still conclude that the evidence supported the conclusion that Lachnicht violated the Taft–Hartley Act. For, "the statutory definition of 'employee' in subsection 152(3) specifically excludes 'any individual employed as a supervisor.'" *United States v. Local 359, United Seafood Workers Union*, 889 F.2d 1232, 1236 (2d Cir.1989). The statute defines "supervisor" as:

> [A]ny individual having authority, in the interest of the employer, to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline other employees, or responsibility to direct them, or to adjust their grievances, or effectively to recommend such action, if in connection with the foregoing the exercise of such authority is not of a merely routine or clerical nature, but requires the use of independent judgment.

29 U.S.C. § 152(11). The Second Circuit has noted that "The definition of 'supervisor' ... is in the disjunctive; thus, an employee who meets any of the criteria set forth in the section is a supervisor under the Act." *Superior Bakery, Inc. v. N.L.R.B.*, 893 F.2d 493, 496 (2d Cir.1990). It is undisputed that Lachnicht was responsible for hiring the longshoremen that were to work for PSN. Indeed, Lachnicht himself testified that he was PSN's hiring agent:

> Q. Does that mean that they don't have to go through the Waterfront Commission's hiring system?
>
> A. Yes.
>
> Q. How is that these people do get hired to work at [PSN]?
>
> A. Through me. I am authorized by the company to do their hiring.

Lachnicht Dep. 69; *see also id.* at 37 (describing himself as a foreman); *id.* at 66 (describing himself as a supervisor); Tr. 4287 (Zimmern); Tr. 5426–27 (Trant). Congress did not intend to reach a "supervisor" such as Lachnicht by using the term "employee" in the Taft–Hartley Act. *Cf. Superior Bakery*, 893 F.2d at 495–96. Therefore, Lachnicht would not be entitled to invoke the Taft–Hartley Act's first exception.

**G. Lachnicht Alleged Provision of Organized Crime Figures With "No–Show" Waterfront Jobs**

We turn next to the government's allegation that Lachnicht provided organized crime figures with "no-show" waterfront jobs and thereby (1) aided and abetted a Hobbs Act violation; (2) aided and abetted multiple violations of the Taft–Hartley Act; and (3) violated the federal wire fraud statute.

*Findings of Fact*

The evidence presented at trial showed that Lachnicht assisted other PSN "employees," who did not show up for work, to draw pay checks from PSN. Specifically, Lachnicht falsely informed PSN that Tom Bruno, Jackie Bruno, and Richard DeSciscio were present and performing their duties as longshoremen even though they were not even appearing at Claremont Terminal.[73]

As noted above, it was Lachnicht's job as PSN's hiring agent to find out when ships would be in at Claremont Terminal, to contact the ten longshoremen on days when ships were loaded, to check the longshoremen in, and to inform PSN which longshoremen came to work and were entitled to be paid. *See* Lachnicht PFF & CL ¶ 19. Although the timekeeper at PSN was a member of ILA Local 1, rather than Local 1588, it was Lachnicht's duty to inform the timekeeper when a ship would be in and to notify PSN if the timekeeper failed to show up for work on days when a ship was in. Tr. 4296, 5130–31, 5171 (Zimmern); Tr. 5435–36 (Trant).[74]

The evidence demonstrated that in the 1970's, Tom Bruno, the PSN timekeeper, moved to Florida and stopped showing up for work. Tr. 4291–92 (Zimmern). For some period thereafter, Lachnicht noted Bruno as "present," and PSN, in reliance on Lachnicht's representation, continued to pay Bruno on days when ships were in. *Id.* When Zimmern learned that PSN was paying Bruno, even though he was not coming to work, Zimmern stopped the payments. Bruno then threatened Zimmern, warning

him that if PSN did not pay him, Bruno would see to it that a union policy that had previously been relaxed by Local 1 would be enforced to PSN's detriment.[75] Tr. 4291–92, 5180 (Zimmern). Zimmern, accordingly, resumed payments, and Lachnicht continued to indicate that Bruno was "present." Tr. 4291–92, 4295–96 (Zimmern).[76]

When Tom Bruno retired, Bruno's son, Jackie Bruno, was hired as a replacement. Lachnicht allowed Jackie Bruno to be paid for "four to five months" without showing up before taking any steps to have the timekeeper replaced. *See* Lachnicht Dep. at 95–98. Of course, Jackie Bruno could not have been paid on the days that he did not show up without Lachnicht's assistance. Tr. 4296, 5130–31, 5171 (Zimmern); Tr. 5432–36 (Trant).

Richard DeSciscio, a longtime associate of DiGilio, was hired to replace Jackie Bruno in 1985. Lachnicht Dep. at 95; Tr. 4295–96 (Zimmern). With Lachnicht's assistance, DeSciscio was paid by PSN even though he did not show up for work. GX 3425, ¶ 28 (Lenehen); GX 5591 at 39, 89 (Tiner Deposition); Gallagher Dep. at 160–160; Tr. 4296, 5130–31, 5171 (Zimmern); Tr. 5435–36 (Trant). Because it was Lachnicht's duty to note whether the timekeeper was present, Lachnicht's complicity was an essential element in DeSciscio's scheme to maintain a "no-show" job at PSN.

*Conclusions of Law*

After considering all the evidence, the Court concludes that Lachnicht (1) aided and abetted Tom Bruno's extortion of his

---

**73.** Lachnicht concedes that he was friendly with at least seven Genovese Associates and that he hired six of them at PSN. Lachnicht's PFF & CL ¶¶ 4, 5. Given this admission, Lachnicht's claim that he was unaware that a substantial number of his associates were aligned with the Genovese family is not credible.

**74.** Lachnicht does not dispute that it was his responsibility to notify PSN if the timekeeper failed to show up for work on days when a ship was in. He does argue that the government failed to prove that he had the authority to hire the PSN timekeeper. Lachnicht's PFF & CL ¶ 22 n. 4. We agree with Lachnicht that there was insufficient evidence to prove that La-

chnicht had the authority to hire PSN's timekeeper. His deposition testimony indicates that it was Fullam who hired both Jackie Bruno and Richard DeSciscio.

**75.** Local 1 had a policy that each company employ both a timekeeper and a clerk. At this time, PSN employed only a timekeeper.

**76.** Lachnicht contends that it was he who informed Zimmern that Bruno was not showing up for work. *See* Lachnicht Dep at 96. Zimmern's trial testimony—though it does not directly contradict this assertion—makes such a scenario unlikely. *See* Tr. 4290–94 (Zimmern).

"no-show" job; (2) aided and abetted multiple violations of the Taft–Hartley Act; and (3) violated the federal wire fraud statute. We will consider each of these violations separately.

In a civil RICO suit, the Court applies the criminal standard in determining aiding and abetting liability. *Local 560*, 780 F.2d at 284; *District Council*, 778 F.Supp. at 748. As we noted above, the Second Circuit has stated the elements of aiding and abetting as follows:

> To convict a defendant of aiding and abetting the government must prove (1) commission of the underlying crime, (2) by a person other than the defendant, (3) a voluntary act or omission by the person charged as an aider and abettor, with (4) the specific intent that his act or omission bring about the underlying crime.

*United States v. Zambrano*, 776 F.2d 1091, 1097 (2d Cir.1985) (citations omitted).

■ First, Lachnicht aided and abetted Tom Bruno's scheme to extort his "no-show" jobs from PSN in violation of the Hobbs Act. The evidence demonstrates that Tom Bruno forced PSN to continue paying him while he was in Florida by warning Zimmern that, if PSN did not continue to pay him, Local 1's policy that each company employ a timekeeper and a clerk would be enforced to PSN's detriment. Tr. 4291–92, 4295, 5180 (Zimmern). This constitutes a Hobbs Act extortion. Lachnicht assisted Bruno in this scheme by checking Bruno off as "present" while Bruno remained in Florida and therefore is liable for aiding and abetting Bruno's extortion of his waterfront job. Tr. 4291–92, 5196 (Zimmern).

The government also appears to argue that Lachnicht aided and abetted Jackie Bruno and Richard DeSciscio's extortion of their PSN "no-show" jobs. *See* Govt's Post Trial Brief at 147–48. We believe that it is a much closer question whether Jackie Bruno and DeSciscio extorted their jobs. Although we conclude that Jackie Bruno and DeSciscio's timekeeper jobs were "no-show" jobs, there is no evidence that they ever made a direct threat, as had Tom Bruno, to PSN in order to retain employ-

ment. Of course, Jackie Bruno and DeSciscio could both be found to have committed Hobbs Act extortions if they made use of "fear" to keep their jobs. *Covino*, 837 F.2d at 68); *see also* Part IV.E.1 (discussion of Lachnicht's Hobbs Act extortion of his own "no-show" job). The issue then becomes whether these longshoremen exploited Zimmern's fear of labor troubles, *i.e.*, whether Jackie Bruno and DeSciscio were beneficiaries of Tom Bruno's direct threat of labor unrest. We simply do not believe that the government has sustained its burden of demonstrating by a preponderance of the evidence that such was the case. Therefore, we conclude that Lachnicht could not have aided and abetted Hobbs Act extortions by Jackie Bruno and DeSciscio because the evidence does not demonstrate that the these longshoremen violated the Hobbs Act.

■ Second, the government alleges that Lachnicht aided and abetted multiple violations of the Taft Hartley Act. In addition to paying these three "phantom" longshoremen a "salary," PSN made contributions on their behalf to the ILA and Locals 1 and 1588 as union "dues." G'Sell Dep at 197.12–198.8; Tr. 5714 (Sanzo); GX 3404A (NYSA's Response to Subpoena for All Records Concerning McLaughlin). Payments by an employer to a union are prohibited by the Taft–Hartley Act unless a statutory exception is applicable. *See United States v. Ricciardi*, 357 F.2d 91, 99–100 (2d Cir.1966). The statute, however, permits an employer to pay to the union a portion of an "employee's" wage withheld as union dues. 29 U.S.C. § 186(c)(4). As discussed above, the term "employees" as used in the statutory exception is limited to "bona fide" workers—not phantom employees. *See* Part IV.E.2. Because Lachnicht played an essential role in the scheme by which payments were made by PSN to the union on behalf of these phantom longshoremen, Lachnicht is liable for aiding and abetting multiple violations of the Taft–Hartley Act.

■ Finally, the government contends that Lachnicht violated the wire

fraud statute. 18 U.S.C. § 1343. The federal wire fraud statute provides:

> Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be [guilty of a crime].

18 U.S.C. § 1343. To prove a violation of the wire or mail fraud statutes, the government need only establish the defendant's participation in a scheme to defraud and the use of interstate communications in connection with the scheme. *See, e.g., United States v. Rodolitz,* 786 F.2d 77, 80 (2d Cir.), *cert. denied,* 479 U.S. 826, 107 S.Ct. 102, 93 L.Ed.2d 52 (1986). While the government must prove that the defendant intended to participate in the scheme to defraud, fraudulent intent need not be—and often is not—proven by direct evidence. *United States v. Panza,* 750 F.2d 1141, 1149 (2d Cir.1984).

We agree with the government that the use of the telephone was a contemplated element of the scheme through which Tom Bruno, Jackie Bruno, and Richard DeSciscio maintained their "no-show" jobs at PSN. PSN would generally inform Lachnicht by telephone that a ship would arrive at Claremont Terminal. Tr. 5407, 5411 (Trant). Lachnicht and PSN understood that, by doing so, PSN would rely on Lachnicht to procure—usually by telephone—the presence of the other ten longshoremen to perform work on the day that the ship arrived. Tr. 4282–83 (Zimmern). On the day when the ship arrived, Lachnicht would defraud PSN by informing the company that the time keeper was present when in fact he was not at the port. We also infer that the jurisdictional prerequisite for invocation of the wire fraud statute has been satisfied, *i.e.,* that Lachnicht engaged in

*interstate* communications, considering the number of phone calls that Lachnicht made to various entities, including the shipping company, PSN, and the various longshoremen.[77] *See McCoy v. Goldberg,* 748 F.Supp. 146, 154 (S.D.N.Y.1990) ("The federal wire fraud statute does not cover telephone communications between persons within the same state."). We therefore conclude that the government has proved by a preponderance of the evidence that Lachnicht violated the wire fraud statute.

## H. Lachnicht Workers' Compensation Claim

■ We next consider the government's allegation that a worker's compensation claim submitted by Lachnicht violated the mail fraud statute. On November 27, 1989, Lachnicht submitted a worker's compensation claim alleging that on November 21, 1989, he was hit on the head and shoulders by "falling steel." GX 4492 (worker's compensation claim). It is the government's contention that Lachnicht submitted the worker's compensation claim knowing that he had not been involved in an accident in order to defraud PSN and its insurance carrier, and that this claim involved use of the mails. Tr. 5958 (Haidri).

The jurisdictional element of use of the mails is not in dispute. The alleged fraudulent nature of the claim was sharply disputed and indeed was the only factual issue in these extended proceedings which gave rise to the calling of defense witnesses.

The government's claim is for the most part predicated on negative inferences which it asks the Court to draw from the following circumstances:

1. The assertion by Lachnicht of his fifth amendment privilege with respect to questions relating to this compensation claim;

2. Jude Tiner, an alleged eye witness to the accident who, unrepresented by counsel, described the accident at a deposition, but then asserted his fifth amendment priv-

---

77. We also note that Lachnicht did not specifically dispute that he engaged in interstate communications. *See* Lachnicht's PFF & CL ¶ 27

(bald statement that there is no proof that Lachnicht violated the wire fraud statute).

ilege when called to testify at the trial after counsel had been appointed to represent him;

3. The failure of Lachnicht to call any other witnesses from the work gang on the pier;

4. Lachnicht showed no objective signs of injury when he arrived at the hospital emergency room shortly after the alleged accident although Tiner's deposition description of the accident would suggest that there would be such signs. Tiner had testified that Lachnicht was hit by a four or five foot long wooden plank that fell from a height of twenty-five feet. The account of the accident varied from time to time and witness to witness; and

5. Lachnicht's duties rarely required that he be shipside.

Thus, the government's case consists for the most part of negative inferences and circumstantial evidence. Counterbalancing the government's claims are the following facts and circumstances:

1. Lachnicht was in fact admitted to the emergency room complaining of being hit on the head. Dr. Hsu diagnosed Lachnicht as having a concussion and Lachnicht remained at the hospital *for eight days*. He was discharged with a final diagnosis of: cerebral concussion, post traumatic headaches, cervical sprain, acute L/S sprain (lumbosacral), and contusions and sprain of right upper and lower extremities. (GX 4479).

2. There were unusual weather conditions—"gale force winds"—on the day of the alleged accident which allegedly resulted in confusion on the pier and caused Lachnicht to assume duties usually performed by another.

3. Since the accident, Lachnicht has been under the care of numerous physicians and other health care providers whose records support an inference of an accident on November 21, 1989.

4. Workers' compensation referred Lachnicht to Mary McLarnon, a board certified radiologist and neurologist who testified at this trial. Her analysis was that

Lachnicht had a "herniated disc at the level of c6–c7."

Faced with this far from satisfactory record, we reach the following conclusions. First, we place little weight on the fact that Lachnicht and Tiner have invoked their fifth amendment privileges and that others have not come forward to testify on behalf of Lachnicht. The context of this case and the nature of the government's claims render this a radically different setting than that of a simple personal injury claim. The government has made clear its claim that others involved with Lachnicht had "previously engaged in abuse of the worker's compensation process." Govt's PFF & CL ¶ 118. The consequent reluctance of others to inject themselves in this proceeding is not surprising. While the absence of any corroboration of Lachnicht's claim is obviously of some significance, it is not critical. Nor do we place any weight on the government's attempt to disparage the medical documentation on the grounds that the doctor attending Lachnicht in the hospital had also treated Tiner, whose worker's compensation claim the government also asserts was fraudulent.

In the end, the issue turns on the burden of proof. If the Court were asked whether on this record, Lachnicht had sustained a burden of showing an entitlement to compensation, the answer in all likelihood would be in the negative. But the question before the Court is a far different one: has the government sustained its burden of proving fraud? To satisfy this burden more is required than the negative inferences upon which the government relies. We conclude that the government has not established as a predicate act the alleged mail fraud violation concerning Lachnicht's compensation claim.

## CONCLUSION

Having considered all of the evidence presented in this case, this Court has concluded that the government has sustained its burden of proving the existence of a Waterfront enterprise. We also conclude that it demonstrated that defendants Mangano, Carson, Gallagher, and Lachnicht

each committed at least two predicate acts which satisfy RICO's "pattern requirement" and therefore violated 18 U.S.C. § 1962(c). To summarize our findings with regard to each defendant:

Defendant Venero Mangano aided and abetted Carson's multiple violations of the Taft–Hartley Act in connection with the MOTBY scheme;

Defendant Donald Carson (1) committed multiple Taft–Hartley Act violations in connection with the MOTBY Scheme; (2) committed multiple Taft–Hartley Act violations by accepting meals and entertainment from employers of ILA labor; (3) embezzled his salary and various reimbursements of expenses from Local 1588 in violation of § 501(c); and (4) committed multiple Hobbs Act extortions of Local 1588 members' LMRDA rights.

Defendant Anthony Gallagher aided and abetted Carson's multiple violations of the Taft Hartley Act in connection with the MOTBY scheme.

Defendant George Lachnicht (1) aided and abetted Carson's multiple extortions of Local 1588 members' LMRDA rights; (2) committed a Hobbs Act extortion of his own "no-show" job; (3) violated the Taft–Hartley Act by accepting various things of value from his employer; (4) aided and abetted Tom Bruno's Hobbs Act extortion of Bruno's "no-show" job; (5) aided and abetted multiple violations of the Taft–Hartley Act in connection with the "no-show" jobs of Tom Bruno, Jackie Bruno, and Richard DeSciscio; and (6) violated the federal wire fraud statute in connection with the "no-show" jobs of Tom Bruno, Jackie Bruno, and Richard DeSciscio.

Thus we find that the government has sustained its burden of proving by a fair preponderance of the evidence that each of the four remaining defendants violated RICO in the manner set forth above.

In addition, the complaint in *Carson v. Local 1588*, 90 Civ. 5618 (LBS), is dismissed in its entirety, as per Section IV.C.2 of this Opinion.

This Opinion marks the end of the liability phase of this case. The parties are to advise the Court in writing on or before February 15, 1993 as to the proposed dates and nature of further proceedings herein.

SO ORDERED.